**P. W. BROOKS & CO., Inc., v. NORTH CAROLINA PUBLIC SERVICE CO.**

Circuit Court of Appeals, Fourth Circuit. January 14, 1930.

No. 2896.

Chester Rohrlich, of New York City, and F. P. Hobgood, Jr., of Greensboro, N. C. (Hobgood & Vinson, of Greensboro, N. C., and Cook, Nathan & Lehman, of New York City, on the brief), for appellant.

R. M. Robinson, of Greensboro, N. C. (W. S. O'B. Robinson, Jr., of Charlotte, N. C., on the brief), for appellee.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge. This is an appeal in an action at law instituted by P. W. Brooks & Co., a corporation, as plaintiff, against the North Carolina Public Service Company, as defendant, to recover damages on account of the latter company's refusal to convert certain mortgage bonds which it had elected to redeem. A jury trial was waived by written stipulation, and the facts were found by the District Judge. From a judgment thereon in favor of defendant, plaintiff has appealed.

There is no dispute as to the facts. The bonds in question were issued in the year 1919 by the Piedmont Power & Light Company, whose property was subsequently taken over and whose obligations were assumed by the defendant. They bore 6 per cent. interest and matured May 1, 1934. Article III, section 1, of the mortgage securing them made provision that the company at its option, on any interest date thereafter, might redeem them, or any part of them, at 105 per cent., by giving notice of intention to redeem by publication at least once a week for four successive weeks immediately preceding the date fixed for redemption in a newspaper published in New York and Philadelphia, and by depositing with the trustee sufficient funds for paying the principal and interest on the bonds to be redeemed before the first publication of the notice. The funds so deposited were to be held by the trustee and paid to the holders of the bonds upon their presentation and surrender.

Due to a stringency in the money market, the company experienced difficulty in marketing the bonds, and in March, 1921, to render them more readily salable, it executed what is referred to as an "Additional Interest Indenture," wherein it agreed to pay 7 per cent. interest on those which had not been sold. This instrument provided that any or all of the bonds sold on the 7 per cent. basis might, at the option of the company, be called for redemption at 103 per cent., and accrued interest on the 1st day of May, 1923, or any interest date thereafter before maturity The original mortgage, after making provision for a sinking fund, had provided that the trustee should use same in purchasing outstanding bonds, and, if unable to purchase them at the rate fixed for redemption, should call for redemption sufficient bonds for that purpose, selecting same by lot. The Additional Interest Indenture provided that none of the 7 per cent. bonds should be called for redemption prior to 1923, but that thereafter no distinction should be made between the bonds in drawing same for redemption, except that those bearing 7 per cent. should be redeemable at 103 and those bearing 6 per cent. at 105.

This additional interest indenture contained, also, a provision as to conversion, which is as follows:

"Section 2. It is covenanted and agreed by the company that the holders of any or all of said first mortgage bonds issued on a 7% basis, pursuant to the terms hereof, may, at any time prior to maturity, convert said first mortgage bonds issued on a 7% basis into first mortgage bonds of the same issue and maturity issued on a 6% basis, said bonds issued on a 7% basis to be received by the company for said purpose at par and accrued interest, and the said bonds issued on a 6% basis to be issued and delivered by the company for said purpose at 92 and accrued interest, any fractional difference to be paid in cash by the company, or to be ap-

plied on the purchase of an additional one hundred dollar ($100) first mortgage bond at 92 and accrued interest, at the option of the holder making said conversion, which option shall be stated in the original notice hereinafter set forth."

On July 30, 1926, defendant decided to exercise the option reserved to it in the Additional Interest Indenture and to redeem on November 1, 1926, all of the bonds secured by the mortgage. For that purpose it deposited with the trustee a sufficient amount to redeem the outstanding 6 per cent. bonds at 105 and the outstanding 7 per cent. bonds at 103. On July 31st, it published in newspapers in New York and Philadelphia notice of the redemption, together with a notice that from and after the date of publication the privilege to convert from 7 per cent. to 6 per cent. bonds was terminated.

Plaintiff is a brokerage company of New York. At the time of the publication of the notice it held 7 per cent. bonds in the amount of $4,200. It at once presented these to the trustee and demanded that they be converted into 6 per cent. bonds at the rate of exchange provided in the Additional Interest Indenture. The trustee, however, having been notified by the defendant that no further conversions should be made, refused to proceed in the matter. Plaintiff thereupon acquired other 7 per cent. bonds totaling, with those originally held, the sum of $87,-000, and demanded that all of them be converted. Defendant refused to recognize the right of conversion, and deposited no additional funds with the trustee for that purpose. Shortly before November 1st, plaintiff delivered all of the bonds to the trustee for redemption and accepted payment therefor at the rate of 103 per cent. and interest. One lot of the bonds was accompanied by a letter in which plaintiff said: "We are delivering these bonds for redemption without prejudice to our previous demand for conversion and without waiving our rights by reason of the company's refusal to carry out the conversion to which we were entitled. Kindly let us have proceeds of the redemption as soon as convenient." It is admitted that the amount received by plaintiff was less by $9,667.17 than it would have been, if the 7 per cent. bonds had been converted into 6 per cent. bonds at the rate of exchange provided by the Additional Interest Indenture, and these 6 per cent. bonds had then been redeemed at 105.

The contention of plaintiff is that under the terms of the Additional Interest Indenture it had the right to convert its bonds at any time before maturity; that it demanded conversion before maturity, even if maturity be construed as the date fixed for redemption; and that, conversion having been refused, it is entitled to recover as damages the difference between what it received from the trustee and what it would have received if conversion had been allowed and the converted 6 per cent. bonds redeemed. We think, however, that this contention rests upon an erroneous interpretation of the conversion clause of the Additional Interest Indenture. Plaintiff says that it is prepared to concede, "in violation of the well established principle that instruments are to be construed most strongly against the party which prepared the instrument," that the word "maturity," as used in the conversion clause, may be construed to mean May 1, 1934, or any earlier maturity date as fixed by a redemption of the bonds; but we do not think that this conceded construction is by any means the proper one when the conversion clause is construed, as it must be, in connection with the provisions of the redemption clause.

The indenture reserved to the issuing corporation the option of redeeming any of the bonds issued. It gave to any holder of a 7 per cent. bond the option of converting same, "at any time prior to maturity," into a 6 per cent. bond at a certain rate of exchange. Both options must be construed together; and, when so construed, it is clear that the meaning is that the conversion privilege shall extend to the maturity of the bonds, unless the company in the meantime has exercised its option to redeem, but that, when the option to redeem has been exercised, the option to convert is terminated. If this were not true, the option to redeem, so carefully reserved, would be rendered practically nugatory.

Plaintiff concedes that the exercise of the option to redeem cuts off the conversion privilege after the date set for redemption, but contends that until this date the conversion privilege is preserved. We think, however, that this involves a strained and unreasonable construction of the instrument. In the first place, such a construction would virtually nullify the option to redeem in cases where only the 7 per cent. bonds might be called, allowing the attempted redemption, in such cases, to be avoided after the company had done everything which it was required to do to effect same, including the deposit of money with the trustee. In the second place, should the option be exercised, as it has been here, to redeem all of the bonds, such a con-

struction would practically nullify the provision that those bearing 7 per cent. interest are redeemable at 103 per cent. and would make them redeemable 10 points higher, or at 113 per cent.; for, of course, if allowed so to do, holders of 7 per cent. bonds would convert into 6 per cent. bonds at 92 and have these redeemed at 105. It is not reasonable to suppose that such absurd consequences were intended; and it is elementary that, if possible, a construction of one of the provisions of an instrument is to be avoided which nullifies other provisions or leads to absurd consequences. The whole instrument must be construed together and given a reasonable construction, under which, if possible, all of its provisions may stand. Such a construction in this case requires that the conversion privilege be construed as limited by the right of redemption, and as terminated when the option to redeem has been properly exercised.

That this is the correct construction appears conclusively, we think, from the provision with regard to calling bonds for redemption for the sinking fund. In the original mortgage it was provided that the company should make payments to the trustee for the purpose of creating a sinking fund, and that this sinking fund should be used for the purchase and retirement of bonds. It was made the duty of the trustee, in case he was unable to purchase sufficient bonds at the price fixed for redemption to absorb the sinking fund, to select bonds for that purpose by lot and to call them for redemption under the provisions of the indenture. As heretofore stated, the Additional Interest Indenture provided that no distinction should be made between bonds in drawing same for redemption, except that the 7 per cent. bonds should be redeemable at 103 and the 6 per cent. bonds at 105, the exact provision with regard thereto being as follows:

"Inasmuch as the bonds issued on the said seven per cent. basis cannot be called for redemption prior to May 1st, 1923, the provisions of Article III, Section 2, of the First Mortgage providing for the calling of bonds for redemption shall be suspended as to the bonds issued on the said seven per cent. basis pursuant to the terms of this indenture until the 10th day of September, 1923, on and after which date said provisions of Section 2 of Article III of said First Mortgage shall apply to all of said First Mortgage Bonds, whether issued on a six per cent. basis or on a seven per cent. basis, and *no distinction shall thereafter be made between said bonds in drawing same for re-*

*demption, except that the bonds issued on a seven per cent basis shall be redeemable at one hundred and three per cent* (103%) *and accrued interest, and bonds issued on a six per cent basis at one hundred and five per cent* (105%) *and accrued interest."* (Italics ours.)

In the light of this provision, can it be reasonably contended that the trustee, after selecting the bonds to be redeemed by lot and taking steps to redeem same, should have the redemption as to the 7 per cent. bonds so selected nullified by conversion, or that he should be required to pay anything in excess of the 103 per cent. which the instrument expressly provides? To ask the question is to answer it.

It is said that, under the interpretation which we have given the instrument, the right to convert could be nullified by exercising the option to redeem far in advance of the time fixed for redemption. It is a complete answer to this, however, that it is a condition precedent to the exercise of the option that the money to pay the principal and interest on the bonds be deposited with the trustee; and it is not reasonable to suppose that such deposit would be made and the money allowed to lie idle except within the six months period preceding the interest date fixed for redemption. The instrument does not specify how long before the redemption date the option shall be exercised and the deposit made, except that there must be advertisement for four weeks immediately preceding redemption and that the deposit must be made before the advertisement. If these requirements are complied with, it, of course, could not invalidate the exercise of the option that the deposit was made at an earlier date or the advertisement made for a longer period.

It is said that the right of conversion cannot be cut off by mere notice on the part of the company. This is true; but what cuts off the right of conversion here is, not mere notice, but the exercise of the option to redeem in accordance with the terms of the indenture and the deposit of the money pursuant thereto. When this was done, the right to convert was cut off, not by action of the company, but by the terms of the indenture itself.

For the reasons stated, we think that the plaintiff had no cause of action against defendant for refusing to convert the bonds which had been duly called for redemption; but we agree with the learned judge below that, if plaintiff had had such cause of ac-

tion, same was extinguished by delivering the bonds to the trustee and accepting the amount which had been deposited for the purpose of their redemption. The question involved is not whether one who has a cause of action for refusal to convert stocks or bonds can maintain an action after parting with them, although it would seem clear that where a right is incidental to the ownership of a bond the transfer of the bond transfers the right also; but the question is whether a plaintiff, being faced with an election between inconsistent rights, can elect one and maintain an action upon the basis of the other. If, as plaintiff contends, it had the option either to accept the amount tendered for redemption of the bonds or to insist upon their conversion, it is clear that it could not do both. Having accepted the amount tendered for redemption and surrendered the bonds, it is thereby estopped from insisting upon the right to convert. And we think that plaintiff is precluded from now insisting upon conversion for the further reason that the right of conversion was a right incidental to or arising out of the existence of the bonds; and that, when same were redeemed and the obligation which they evidenced was extinguished, the incidental right of conversion also was necessarily extinguished.

On the question of estoppel, there is no dispute that the money which was received by plaintiff for the bonds was deposited with the trustee for their redemption. Some question is raised in the briefs as to what conditions were imposed upon the acceptance of this money by the plaintiff; but this matter is entirely clear. While no conditions were expressed, it was necessarily implied from the fact that the money was deposited for the purpose of redemption, that same was not to be paid out unless the bonds, with all rights thereunder, were surrendered for cancellation. Having accepted money deposited for such purpose, plaintiff will not be heard to assert rights inconsistent therewith. See Pacific Railroad v. U. S., 158 U. S. 118, 15 S. Ct. 766, 39 L. Ed. 918; White Oak Coal Co. v. United States (C. C. A. 4th) 15 F.(2d) 474, 477, 479. And the effort on the part of plaintiff to preserve rights under the bonds, by protesting its right of conversion while demanding and receiving the funds deposited for redemption is, of course, unavailing; for, in the language of the Scottish law, a man shall not be allowed at the same time to approbate and reprobate. Capital City Bank v. Hilson, 64 Fla. 206, 60 So. 189, Ann. Cas. 1914B, 1211; Nassoiy v. Tomlinson, 148 N. Y. 326, 42 N. E. 715, 51 Am. St. Rep. 695, 698; 20 C. J. 3, 21.

And there can be no question that the right of conversion was a right incidental to the bonds. When they were extinguished by redemption, therefore, this right was extinguished also; for it is a well-settled proposition of law that incidental rights, such as the right to interest, etc., are extinguished with the extinguishment of the principal obligation. Pacific R. R. v. U. S., supra; Stewart v. Barnes, 153 U. S. 456, 14 S. Ct. 849, 38 L. Ed. 781; Savage v. U. S., 92 U. S. 382, 386, 23 L. Ed. 660; Moore v. Fuller, 47 N. C. 205.

The principle was thus stated by the Supreme Court of North Carolina in the case last cited:

"The general principle is, that where the principal subject of a claim is extinguished by the act of the plaintiff, or of the parties, all its incidents go with it. * * * This is an action of debt on a bond to recover the interest, the principal having been paid by the defendant before the bringing of the action; by that payment, the bond was discharged, and by analogy to the cases referred to the plaintiff cannot recover the interest, which is but an incident to the principal."

The case of Savage v. U. S., supra, is directly in point. In that case, the holder of treasury notes of the United States claimed the right to be paid in gold and not in depreciated legal tender notes. The Secretary of the Treasury refused payment in gold but tendered currency. The holder accepted payment in this medium under protest and immediately instituted suit for the difference between the market value of the gold and the currency. The court held that it was not necessary to decide whether or not the holder was entitled to payment in gold; that, by accepting the medium offered and surrendering the treasury notes, he had waived all claim to further payment; and that the protest did not save the claim from extinguishment. The court, speaking through Mr. Justice Clifford, said:

"Such an acceptance of payment was a waiver of the claim antecedently made, and amounted to a full discharge of the same, independently of the question, whether the notes accepted in payment are or are not a legal tender, as insisted by the counsel for the defendants.

"Had not the treasury notes held by the decedent been surrendered to the United States, the effect of the acceptance of the currency-notes in payment might possibly have been different; but it is clear that a protest under such circumstances is utterly insufficient to qualify the effect of the waiv-

er evidenced by the acceptance of what was offered in payment of the treasury-notes in lieu of gold. Gold was claimed; but the secretary refused to pay in that medium: and the agents of the decedent, acting in pursuance of his instructions, accepted the medium offered by the secretary, knowing full well that it was offered in full discharge of the treasury-notes; and it appears that they not only accepted the medium of payment offered by the secretary, but surrendered the treasury-notes to the secretary, as the well-known financial agent of the United States.

"Actual surrender of the treasury-notes to the secretary was a condition precedent to the right of the secretary to redeem the same, and that fact was as well known to the agents of the decedent as to the secretary; and it must be that they knew full well that the payment of the treasury-notes could not be made unless the surrender was absolute and unconditional.

"Viewed in the light of these suggestions, it must be held that the protest, being unauthorized by law, was a mere ex parte act, without any legal efficacy to qualify the voluntary surrender of the treasury-notes, which both parties understood to be absolute and unconditional."

If for the word "gold" in the above quotation "6% bonds" be substituted, the language might well have been used with reference to the case at bar. The demand for gold in that case was exactly the same as the demand for 6 per cent. bonds in this; as in both cases it was claimed that the demand was made pursuant to contract right, and in both cases, after the demand, payment was accepted under protest and the obligations were surrendered for cancellation.

There was no error, and the judgment of the court below is affirmed.

Affirmed.