**SASINOWSKI v. BOSTON & M. R. R.**
No. 2947.

Circuit Court of Appeals, First Circuit.
Jan. 4, 1935.

Joseph Cavanagh, of Boston, Mass. (Wardner & Cavanagh, of Boston, Mass., on the brief), for appellant.

Francis P. Garland, of Boston, Mass. (John De Courcy and Hurlburt, Jones & Hall, all of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a judgment of the District Court of Massachusetts in an action of tort brought by the plaintiff as administratrix to recover damages for the death of her intestate, which occurred when a flat car on which he was riding was derailed while being hauled over the tracks of the defendant's railroad.

Springfield in Massachusetts, and in Bellows Falls, Vt. On July 17 its agent at Cambridge, Mass., entered into an agreement with the defendant for the transportation of the circus equipment above enumerated from Lakeport to Gloucester, Mass.; from Gloucester to Springfield, Mass.; and from Springfield to Bellows Falls, Vt.

The material provisions of the contract are as follows: ·

"First: The Railroad will furnish the use of its railroad and necessary sidings, the necessary conductors, engineers and other trainmen, and sufficient motive power and will perform the switching and placing of cars for loading and unloading at its stations hereinafter named and transport the show, show material, show animals, apparatus and paraphernalia, and persons in charge thereof, employees and performers, and their personal baggage in cars loaded and unloaded by and at the expense and risk of the Show, upon the dates and to make the runs following, to wit:

| Leave | For | About 8:00 A. M. |
|---|---|---|
| Lakeport, N. H. | Gloucester, Mass. | Sunday, July 22nd, 1928. |
| Gloucester, Mass. | Springfield, Mass. | Sunday, July 29th, 1928. |
| Springfield, Mass. | Bellows Falls, Vt. | Sunday, Aug. 5th, 1928. |

At the close of the evidence the District Judge, on motion of the defendant, ordered the jury to bring in a verdict for the defendant. This is assigned as error, and in addition the admission and exclusion of certain evidence during the trial. We think there was no prejudicial error in the admission or exclusion of the evidence to which exceptions were reserved. The real issue before this court is whether the ordering of the verdict for the defendant was warranted on the evidence.

The deceased was an employee of the Bernardi Greater Shows, Inc., hereinafter referred to as the Show, which gave exhibitions throughout the country. Its equipment consisted of animals, live stock, tents, tools, and other paraphernalia for giving circus exhibitions, together with the usual performers, employees, and caretakers, and also included twelve flat cars, one box car, and two coaches for transporting its equipment and employees from place to place.

During the week ending July 22, 1928, the Show had been giving exhibitions at Lakeport, N. H. From this town arrangements had already been made by its agent to give exhibitions in Gloucester and

and deliver loaded cars to the Rutland Railroad. Equipment consists of twelve (12) flat cars, one (1) box car, two (2) coaches owned by the Show; also two (2) flat cars and two (2) box cars to be furnished by the Railroad.

"Any cars furnished by the Railroad shall be transported at the same rates as cars furnished by the Show, but the Railroad assumes no obligation to furnish such cars, and they shall be furnished only at the option of and at such rental charges as may be fixed by the Operating Department of the Railroad, such charges to be in addition to all charges herein provided for."

"Fifth: The liability of the respective parties hereto as to all persons and property transported or to be transported in pursuance of this agreement shall be governed by the provisions hereof, and in that behalf it is agreed that this contract is not made with the said Railroad as a carrier, either common or special, of the said persons or property or any thereof (the compensation to be paid by said Show being wholly inadequate consideration for any such undertaking), but as a hirer to the Show of the cars and motive power and of men to op-

erate the same, and of the right to use the road and tracks of the Railroad to the extent necessary in the premises, and that said road and tracks and the conductors, engineers, trainmen and other employees furnished by the Railroad hereunder or acting or under duty to act in the performance of or in reference to the use or service herein provided for, shall, as between the parties hereto, while used or engaged or under duty to act in such service and employment, be deemed to be the road and servants of the Show, and that the Railroad shall not be liable to the Show, or to any person or persons for any injury or damage which may happen to any persons, or to the cars or property to be or which shall be transported or served hereunder, which may be incidental or referable to the use or service herein provided for, caused by any defect in said motive power, cars, road or tracks, or unsuitableness thereof for such transportation, or by the negligence of said conductors, engineers, trainmen or other servants, or any or either of them, or arising from any cause whatsoever. The filing of this contract with any commission or other public body is not an admission that the Railroad is a common or special carrier hereunder.

"And the Show hereby expressly agrees and binds itself to indemnify, save harmless and protect the Railroad from and against any or all claims, damages, costs and demands in any way arising, incidental or referable to the subject matter of this agreement, for any loss or injury of whatsoever nature or howsoever caused, which may be sustained to the property of the Show or to any property in its use or charge or to the person or property of any of its agents, servants, performers or employees while on or about said road or the premises of said Railroad, or to the person or property of any of those who may come upon said road or said premises, because of the presence there of the Show, or its agents, servants, performers or employees, whether in any case occasioned by the negligence of the Railroad, its agents or servants, or otherwise, and whether occurring during the transportation of the Show or before, after or between runs.

"Sixth: In consideration of and for the use of the said motive power, road, servants and facilities and for the transportation of Show advertising matter and employees, agents and owners, and advertising cars on regular trains as aforesaid, the Show agrees to pay to the Railroad the sum of Eighteen hundred thirty-four and 00/100 dollars ($1834.00), of which dollars, ($ ) shall be applied for payment for transportation by the Railroad at lawful rates of the bonafide advertising agents and bill posters of the Show. Payments shall be made as follows:

To Railroad Agent at Lakeport, N. H., July 21, 1928 in advance..... $609.00
To Railroad Agent at Gloucester, Mass., July 28, 1928 in advance.. 721.00
To Railroad Agent at Springfield, Mass., Aug. 4, 1928 in advance.. 504.00

Total .....................$1834.00

"In addition to the other charges provided herein, the Show shall pay as track rental $1.00 per car per day or fraction thereof, on all cars remaining at any exhibition point longer than 48 hours following the first 7:00 A. M. after arrival, Sundays excluded.

"And the Show does hereby acknowledge that it had the option of shipping its show, both persons and property at higher rates according to the Tariffs, Classifications and Rules of the Railroad and therefor receiving the security of the liability of the Railroad as a common carrier, but has voluntarily decided to ship the same under this contract at the reduced rates above named."

The train hauled by two locomotives, with full crew of engineers, firemen, brakemen, and a conductor, all furnished by the railroad, and a trainmaster, furnished by the Show, in charge of its cars, left Lakeport July 22 at 9:47 a. m. and Alton Bay at 11:03 a. m., and arrived at the point of the accident at 11:31 a. m., traveling the distance from Alton Bay of 12.46 miles in 28 minutes, or at the rate of 26.7 miles per hour.

The accident was due to a draw key, so called, falling out, which held in place the drawbar, coupling the fifth and sixth cars together, both of which cars belonged to the Show; and as a result, the drawbar dropped down on the tracks and derailed three or more flat cars belonging to the Show, on one of which the deceased was riding, and on which was loaded a large wagon which fell on the deceased, causing his death. The drawbar weighed approximately 400 pounds. The draw keys on the cars belonging to the Show were held in place by bolts. The bolts were prevented from falling out by ordinary nuts or cotter pins.

The plaintiff's declaration contains four counts: The first alleging that the defendant allowed its roadbed to become unsafe; the second alleges negligence of the defendant in operating the train; the third, that it was the duty of the railroad to inspect the cars, both those belonging to the Show and those of the railroad, and that the inspection was negligently made; and the fourth alleges general negligence without specifying in what particular.

The court's ruling was made on the ground that the contract for the transportation was a Massachusetts contract to be performed mainly in Massachusetts, and that under either the law of Massachusetts laid down in Robertson v. Old Colony Railroad Company, 156 Mass. 525, 31 N. E. 650, 32 Am. St. Rep. 482, or the law as administered by the federal courts, referring to the case of Chicago, M. & St. P. R. Co. v. Wallace (C. C. A.) 66 F. 506, 510, 30 L. R. A. 161, the contract entered into between the Show and the railroad was a valid contract and prevented recovery by the plaintiff.

The plaintiff contends that since the tort occurred in the state of New Hampshire, it is governed by the law of that state; and relies on the case of Bernardi Greater Shows, Inc., v. Boston & Maine R. R., 86 N. H. 146, 165 A. 124, in which the New Hampshire Supreme Court has held under its law, that not only was the railroad liable to the Bernardi Greater Shows, Inc., but to certain of its injured employees as well.

■ We are not concerned with the law as administered by the courts of New Hampshire, since the rights of the parties here are determined by the contract for the transportation of the Show, which is clearly a Massachusetts contract, and its validity is to be determined by the law of that commonwealth. Gaston, etc., Ltd., v. Warner, 260 U. S. 201, 203, 43 S. Ct. 18, 67 L. Ed. 210; Central Nat. Bank of Washington v. Hume, 128 U. S. 195, 9 S. Ct. 41, 32 L. Ed. 370; Phineas Fonseca v. Cunard Steamship Company, 153 Mass. 553, 27 N. E. 665, 12 L. R. A. 340, 25 Am. St. Rep. 660; Brockway v. American Express Company, 171 Mass. 158, 50 N. E. 626; Clark et al. v. State Street Trust Co., 270 Mass. 140, 169 N. E. 897; Thomas G. Jewett, Jr., Inc., v. Keystone Driller Co., 282 Mass. 469, 185 N. E. 369.

The Restatement of the Law of Conflict of Laws, No. 4, § 366, lays down the general rule as follows: "The law of the place of contracting determines the validity of a contract limiting the carriers' liability. Liverpool & G. W. S. Co. v. Phenix Ins. Co., 129 U. S. 397 [9 S. Ct. 469, 32 L. Ed. 788]."

■ The law appears to be well settled that a railroad is not obliged to receive and transport as a common carrier the cars of a circus carrying its equipment of tents, wagons, animals, and employees, and other paraphernalia; but may make valid contracts for the transportation of such cars over its road and upon such reasonable limitations as to liability as it sees fit to impose. A common carrier is not under any obligation to haul special trains made up by the owners of the cars, and in accordance with a schedule made out by the other party, or otherwise than according to its own routine and in its ordinary course of business. The hauling of a train composed of cars belonging to a circus, made up and loaded by the employees of the circus, to be hauled usually at night, and carrying horses, elephants, and wild and savage beasts, is not the ordinary business of a common carrier. Coup v. Wabash, etc., R. Co., 56 Mich. 111, 114, 115, 22 N. W. 215, 56 Am. Rep. 374; Chicago, R. I. & P. R. Co. v. Hamler, 215 Ill. 525, 530, 74 N. E. 705, 1 L. R. A. (N. S.) 674, 106 Am. St. Rep. 187, 3 Ann. Cas. 42; Cleveland, etc., R. Co. v. Henry, 170 Ind. 94, 95, 83 N. E. 710; Sabol v. Chi. & N. W. R. Co., 255 Mich. 548, 238 N. W. 281; Chicago, M. & St. P. R. Co. v. Wallace (C. C. A.) 66 F. 506, 510, 30 L. R. A. 161; Clough v. Grand Trunk Western R. Co. (C. C. A.) 155 F. 81, 11 L. R. A. (N. S.) 446; McCree v. Davis, Director General of Railroads (C. C. A.) 280 F. 959; Robertson v. Old Colony Railroad Company, supra; Sager v. Northern Pacific R. Co. (C. C.) 166 F. 526, 531; Wilson v. Atlantic Coast Line R. Co. (C. C.) 129 F. 774, affirmed (C. C. A.) 133 F. 1022, certiorari denied 198 U. S. 585, 25 S. Ct. 802, 49 L. Ed. 1173.

It is urged, however, that since the railroad gave the Show an option of having its cars and equipment carried by the railroad as a common carrier, it held itself out as a common carrier of circus cars owned by and loaded with the usual equipment of a circus, and, therefore, could not become a private carrier of such property; and as a common carrier it could not exempt itself from liability for its negligence. The authorities, however, are practically in accord in holding that a railroad has the right to refuse to transport such cars except on its

own terms. The right to give to the owner of a circus the option to have its cars, loaded with its own equipment, transported with the obligations imposed on a common carrier, belongs to the railroad, either to give or refuse. The giving of an option, at least in a single instance, to have cars of a circus transported by the railroad at the regular tariff rates as a common carrier, or for a greatly reduced consideration as a private carrier, could not establish the railroad as a common carrier of circus equipment and a menagerie.

Neither does the practice of transporting ordinary domestic animals compel a railroad to accept and haul as a common carrier cars of a circus, loaded by the employees of the circus, in a train made up by the trainmaster of the circus, and which may consist of large wagons containing tigers, lions, gorillas, wolves, rhinoceroses, hippopotamuses, poisonous snakes, and other wild beasts, and the massive elephants, and with the same obligation as it assumes in transporting ordinary freight, such as flour, coal, or other merchandise. A trainman of a common carrier may be expected to properly care for ordinary domestic animals, when shipped over long distances, but he certainly cannot be expected to qualify as a mahout for elephants, or as a caretaker for a hippopotamus.

While the Bernardi Greater Shows, Inc., does not appear to be a circus of the kind that arrives in the night and leaves in the following night, stopping but one day in each place, it enumerates in its declaration the items that the railroad agreed to carry over its lines as consisting of animals, live stock, tents, and other property, tools and apparatus used in circus exhibitions, indicating that it classed itself as a circus, and it was as such that it sought and contracted for transportation over the lines of the railroad.

 Assuming that the railroad could and did make a valid contract as a private carrier in this instance, and the Show absolved it from all liability for any injuries, not only to its property by reason of negligence of the servants of the railroad, but also from all liability for any injuries to the employees of the Show resulting from such negligence, it is contended that since the plaintiff's intestate did not release the railroad from liability in case of injury, or authorize his employer to do so, an element which appears in many of the express messenger cases, the contract does not constitute a defense to his claim. The cases of Brewer v. New York, L. E. & W. R. Co., 124 N. Y. 59, 26 N. E. 324, 11 L. R. A. 483, 21 Am. St. Rep. 647, and Kenney v. New York C. & H. R. R. Co., 125 N. Y. 422, 26 N. E. 626, are cited in support of this contention. These cases hold that the employee of an express company could not, without his knowledge or consent, be deprived of his right to recover if injured through the negligence of a servant of a railroad over which the express car was being transported.

Other states, as in the case of Cleveland, etc., R. Co. v. Henry, supra, and in Russell v. Pittsburgh, etc., R. Co., 157 Ind. 305, 61 N. E. 678, 55 L. R. A. 253, 87 Am. St. Rep. 214, have held that an employee of a circus, riding on its cars without a ticket entitling him to ride as a passenger on the train, was bound to know that his right to ride was derived from a special contract between his employer and the railroad; that the railroad was acting, not as a common carrier, in which case his rights might be those of an ordinary passenger, but as a private carrier, and that the railroad could exempt itself from all liability due to negligence in operating the train. It has also been held that such employee is bound by whatever contract in this respect his employer may have made, since his right on the train was under the contract, and could rise no higher than its source; and being presumed to know the law that his employer might make such a contract, and that the railroad could exempt itself from all liability for the negligence of its servants, he was bound to inquire as to what his rights were, and, failing to do so, he was held bound by the contract, and to have assumed whatever risk there might be. Long v. Lehigh Valley R. Co. (C. C. A.) 130 F. 870. To some extent, at least, the cases of Clough v. Grand Trunk Western R. Co., supra, certiorari denied 212 U. S. 579, 29 S. Ct. 688, 53 L. Ed. 659; McCree v. Davis, Director General of Railroads, supra, and Robertson v. Old Colony Railroad Company, supra, support this view, though they may be differentiated on other grounds.

Whatever may be the correct rule in this respect, we think the contract between the Show and the railroad was a valid one, and the rights of the plaintiff's intestate must be determined under it. According to its provisions, in consideration of a reduced rate or price, the railroad hired or let to

the Show the necessary locomotives, engineers, and trainmen, including a conductor and brakeman, and allowed the use of its tracks to haul the train from Lakeport, N. H., to Gloucester, Mass., from Gloucester to Springfield, Mass., and from Springfield to Bellows Falls, Vt.

That such a valid contract may be made, provided it does not interfere in any way with the performance by the railroad of its duties to the public as a common carrier, is recognized in Clough v. Grand Trunk Western R. Co., supra; Coup v. Wabash, etc., R. Co., supra; Cleveland, etc., R. Co. v. Henry, supra; McCree v. Davis, Director General of Railroads, supra; also see Denton v. Yazoo & M. V. R. Co., 284 U. S. 305, 308, 52 S. Ct. 141, 76 L. Ed. 310; Standard Oil Co. v. Anderson, 212 U. S. 215, 221, 29 S. Ct. 252, 53 L. Ed. 480; Union Pacific R. Co. v. Chicago, Rock Island & Pacific R. Co., 163 U. S. 564, 16 S. Ct. 1173, 41 L. Ed. 265. The use of the tracks under such a contract is not in the nature of a lease, but under what is termed a "traffic arrangement." Elliott on Railroads, vol. II, § 451.

Of course, if this is a valid contract of hiring by the Show of the employees of the railroad to operate the train, they became the servants of the Show, Denton v. Yazoo & M. V. R. Co., supra, and even if the accident was due to any negligence of the engineers or trainmen, the railroad is not liable, unless in case of willful or wanton negligence, Sabol v. Chicago & N. W. R. Co., supra, which is not claimed here.

It is claimed, however, that this contract cannot be construed as a contract of hiring, owing to the language of the first paragraph, which provides that "the Railroad shall furnish the use of its railroad, * * * the necessary conductors, engineers and other trainmen, and sufficient motive power, and transport the show, show material, show animals, apparatus and paraphernalia, and persons in charge thereof, employees and performers," which it is urged is an absolute agreement by the railroad to carry the property of the Show over its railroad between the points thereafter named; and that the provisions in paragraphs fifth and sixth for a hiring to the Show of the motive power, trainmen, etc., and the use of its tracks, is so repugnant to the first paragraph that they cannot stand, but must be rejected, leaving only a general contract to transport the Show and its equipment contained in the first four paragraphs.

The plaintiff relies on the rule that where there are two repugnant provisions in a deed or contract, the first must prevail; but this is not an absolute rule. Williston on Contracts, vol. II, § 624. There is another rule equally, if not more important, that the intent of the parties must govern and be determined by the entire contract, in which the purpose of the contract may be considered and all its provisions harmonized, if possible.

"A contract is to be construed as a whole and when possible a construction is to be given to the contract which will give effect to all its terms and provisions, rather than one which will render some nugatory and which could not have been the intent or design of the parties." Federal Law of Contracts, vol. 2 (published by West Pub. Co.) §§ 372, 376.

In Ferguson v. Union Mut. Life Ins. Co., 187 Mass. 8, 10, 72 N. E. 358, 359, the court said, in construing an instrument:

"These clauses should not be construed as repugnant, unless irreconcilable with any reasonable interpretation which incorporates them as forming a harmonious plan for insuring the life of the plaintiff's husband; and a construction is to be adopted which, if possible, will give force and effect to each of them."

"The sole purpose of the interpretation of a contract is to ascertain the intention of the parties when they made it. If possible, every part of a contract must be so construed as to be consistent with every other part and to have effect. It is only when the parts of a contract are so radically repugnant that there is no rational construction that will render them effective and accordant that any part must perish. And the intention of the parties must be deduced, not from specific provisions or fragmentary parts of the agreement, but from the entire contract, because the intent is not evidenced by any part or stipulation of it, nor by the contract without any part or provision, but by every part and term so construed, if possible, as to be consistent with every other part and with the entire agreement." Rushing v. Manhattan Life Ins. Co. of New York (C. C. A.) 224 F. 74, 76.

Also see Heywood v. Perrin, 10 Pick. (Mass.) 228, 230, 20 Am. Dec. 518; New England Cotton Yarn Co. v. Laurel Lake Mills, 190 Mass. 48, 53, 76 N. E. 231; P. W. Brooks & Co., Inc., v. North Carolina Public Service Co. (C. C. A.) 37 F.(2d) 220, 223; Green County, Kentucky v. Quinlan,

211 U. S. 582, 594, 29 S. Ct. 162, 53 L. Ed. 335.

There can be little question as to what the purpose and intent of the parties was in entering into this agreement. Inasmuch as the Show could not insist that its circus equipment be carried by the railroad, its purpose was to secure the transportation of its equipment and employees on its own cars on the most favorable terms from Lakeport to the points named; and an important consideration of the railroad in furnishing the means of transportation was to be relieved of all liability for negligence, either to the Show or to its employees. In carrying out this intent, the parties agreed that the railroad should furnish the Show sufficient motive power, engineers, and trainmen, and allow the use of its tracks, so far as was necessary, to enable the Show to transport on its own cars its circus equipment, including performers and employees, between the points named, and be relieved of all liability for their negligence.

To hold that under the first paragraph, strictly construed, the railroad absolutely agreed to "transport the Show," etc., and that the provisions of the fifth and sixth paragraphs, in so far as they are inconsistent therewith, must be rejected, we think would be straining to the breaking point the doctrine that the first of two inconsistent provisions will stand, and that a later inconsistent provision must be disregarded. To apply it here would result in defeating the obvious intent of these parties, and the purpose for which the contract was entered into.

So much of the first paragraph as provides that, "The Railroad will furnish the use of its railroad and the necessary sidings, and conductors, engineers and other trainmen," is entirely consistent with the provisions of the fifth and sixth paragraphs, and is not the language we would expect to find in an unconditional agreement to transport as freight the equipment, animals, and performers of a circus, and their baggage, either as a private or a common carrier.

In view of the provisions in the fifth and sixth paragraphs specifically defining the relations of the parties, the remainder of the first paragraph may be harmonized with the rest of the contract, if it is treated as expressing the purpose for which the railroad agreed to furnish its railroad and necessary operators to the Show, rather than an absolute agreement to transport the Show as a common carrier. Language in a deed or contract, though absolute in terms, not infrequently is modified by conditions expressed later in the instrument, and is upheld when clearly expressing the intent of the parties.

The real understanding between these parties is found in the fifth and sixth paragraphs, which become the more important parts of the contract, since they are clearly necessary to express the intent of the parties and to carry out the purpose for which the contract was entered into; and when the contract is taken as a whole, should be given effect, even though they qualify a seemingly inconsistent provision in the first paragraph. Williston on Contracts, supra.

However the contract is construed, other than as a contract to transport as a common carrier, which we think it clearly was not, unless there was evidence to go to the jury that the death of the plaintiff's intestate was due to the negligence of a servant of the railroad, the motion to direct a verdict was properly granted.

 An examination of the evidence does not disclose evidence of any negligence on the part of the employees of the railroad when acting in its behalf, which can be said to have been a contributing cause of the death of the plaintiff's intestate. The first allegation of negligence is that the tracks and roadbed of the railroad were unsafe; but there is not even a scintilla of evidence in support of this count. The section foreman of the railroad testified that he went over this track every day except Sunday, and examined this track the day before the accident, and it was in good condition. There is not the slightest evidence that the derailment of the Show's cars, which were the sixth, seventh, and eighth from the engine, and the front wheels of the ninth, was caused by any defect in the tracks of the railroad. In fact, the evidence clearly establishes as the sole cause of the derailment the falling of the drawbar onto the track, which was too large for the axles of the Show's cars to pass over it.

The only other specific allegations of negligence are in the second and third counts alleging that the train was run at an excessive speed, and that the cars were improperly inspected. If the contract on the part of the Show was one of hire, of motive power and operators, any negligence of the engineers in running the train at excessive speed would be the negligence of the Show and not of the railroad.

While it appears from a stipulation that the average speed of the train between Alton Bay, N. H., and the point of accident, was slightly above the rule of the railroad governing the rate of speed on this section of its road, it was not shown that it contributed in any way to the derailment of the cars; or was the cause of the falling out of the draw key and the falling of the drawbar. To so find would be mere speculation and form no basis for a jury verdict.

It appears, however, in the testimony that a regular car inspector and servant of the railroad, at the direction of his foreman, did make the customary inspection, not only of the cars belonging to the railroad, but also of the cars of the Show; but there is nothing in the contract which made it the duty of the railroad to inspect the cars of the Show, or evidence that in voluntarily doing so it was negligently done. The railroad, under the contract, had no control over the cars of the Show. The doctrine of res ipsa loquitur, therefore, has no application here. The control over the Show's cars and the duty to see they were in a safe condition was in the Show, not in the railroad.

Between the time of the inspection on July 17 and the time of leaving Lakeport, they were being repaired by the employees of the Show under the direction of its own trainmaster. The inspector, who was called by the plaintiff and whose testimony was not contradicted, testified that he made a thorough inspection of each car, including its gear, the drawbar, and couplings, and while of his own accord he made some slight repairs on one car, it had nothing to do with either a draw key or drawbar, and could in no way have been connected with the cause of the accident. He examined the cotter pins, bolts, and nuts holding the draw keys in place, and found that they appeared to be in good condition. He called the attention of the Show's trainmaster to the condition of certain of the brakes, which the trainmaster promised to remedy, and informed the inspector on the day the train was ready to start it had been remedied. While the inspector in inspecting the cars of the Show was performing no duty devolving upon the railroad under its contract, the railroad had a right to do so in order to see that they were safe to haul over its road, lest injury should result to its own cars, locomotives, and employees, even though it was temporarily loaning them to the Show. There is, however, no evidence whatsoever of a lack of due care in so doing that in any way contributed to the accident.

The accident is known to have been caused by the falling of the drawbar. The bolt or bolts holding the draw key in place between the fifth and sixth cars of the train evidently fell out or broke. So far as the evidence discloses, it may have broken, due to a flaw in the metal of which it was constructed. A defect or weakness from use may have existed that would not be apparent even to the most rigid ocular inspection. In any event, it was furnished by the Show and not by the railroad. On this record, what actually caused the draw key to fall out is pure speculation. The burden was on the plaintiff to prove that the cause of the accident was the negligence of the railroad. To go to a jury, it required some actual proof, not merely grounds for speculation. The order of the District Court was proper, not only because it was a Massachusetts contract and construed according to the law of Massachusetts and the law recognized in the federal courts relieved the railroad of liability, but also because there was no evidence of negligence on the part of the railroad of sufficient weight to be submitted to the jury.

No other specific negligence on the part of the railroad is alleged or claimed, and no proof of any was offered.

The judgment of the District Court is affirmed, with costs.

BINGHAM, Circuit Judge, dissents.