**CEREDO MORTUARY CHAPEL, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 91–1434 C.

United States Court of Federal Claims.

Sept. 22, 1993.

---

Andrew D. Tenenbaum, with whom was Paralee White, Washington, DC, for plaintiff.

Brian M. Simkin, with whom were Asst. Atty. Gen., Stuart M. Gerson, David M. Cohen and Mary Mitchelson, Washington, DC, for defendant.

## OPINION AND ORDER

TURNER, Judge.

This opinion addresses defendant's motion for summary judgment filed on March 1, 1993 and plaintiff's cross-motion for partial summary judgment on liability filed March 29, 1993. Oral argument was held on August 3, 1993.

### I

After an ordinary solicitation and sealed bid process, the Veterans Administration Medical Center (VAMC) in Huntington, West Virginia, on September 29, 1986, awarded a contract for ambulance service to plaintiff, Ceredo Mortuary Chapel, Inc. The contract period ran from October 1, 1986 to September 30, 1987.

The solicitation included VAMC's estimated orders for ambulance trips and related services for the year. Bids were solicited on a unit price basis, but the solicitation also requested total price estimates. For example, in response to VAMC's estimate that 100 ambulance patients would need oxygen, plaintiff made both a per-unit bid of $15 and a total oxygen provision bid of $1,500. Plaintiff's winning bid on the entire estimated service package was $194,-375 for the year. Appendix to Def.Br. (Solicitation, Offer and Award) at 2.

The agreement neither guaranteed Ceredo the estimated volume of orders as a minimum nor prohibited the government from ordering more than estimated. Payment was to be made monthly based on services actually provided. During the contract period, VAMC's orders from and payments to Ceredo far exceeded the solicitation estimate, amounting to $297,340. Def. Proposed Findings of Uncontroverted Facts at 3. During this time, VAMC also bought ambulance services from other suppliers. *Id.*

The controversy in the parties' cross-motions turns largely on the interpretation of the following part of Section H in the agreement, pertaining to "Special Contract Requirements":

J. ORDERS

. . . .

2. If the contractor fails to furnish ambulance service within –45– minutes after receiving a routine call request or –30– minutes after receiving an emergency request, the Veterans Administration reserves the right to obtain the service from another source and charge the contractor with any excess cost. . . .

3. When the contractor has been notified in advance of a scheduled run and service is not provided within –15– minutes after the scheduled time, the Veterans Administration reserves the right to obtain the service from another source and charge the contractor. . . .

4. The Veterans Administration will be the sole judge in determining when to order service from another source. However, in no instance will the contractor be required to furnish more than three (3) ambulances at one time.

Cplt.Ex. 2 (Solicitation, Offer and Award) at 9 (hereafter, respectively, Paragraphs 2, 3 and 4).

## II

While the contentions of the parties will be more fully discussed below, in brief terms the plaintiff interprets the agreement to mean that VAMC contracted to buy all its ambulance needs for the year from Ceredo. According to the plaintiff, this contract was breached when VAMC sought ambulance service from other suppliers without giving plaintiff the first opportunity to perform within the time limits specified in Paragraphs 2 and 3. Plaintiff claims entitlement to lost profits on any such procurements from outside suppliers.

Defendant, on the other hand, cites Paragraph 4 in arguing that the agreement is, in effect, simply a price schedule which left VAMC with no obligation to order any services whatsoever from Ceredo. Defendant contends that Paragraph 4 allowed the defendant to use other ambulance services at its own discretion. Under this interpretation, since defendant has paid for all the ambulance services plaintiff actually rendered, plaintiff has no claim.

■ The question, then, is whether the agreement is an enforceable requirements contract, as plaintiff argues, or rather is an unenforceable indefinite quantity agreement under which VAMC was not obligated to buy even a minimum amount, as defendant argues. This, like all issues of contract interpretation, is a question of law. *Quaker State Oil Refining Corp. v. United States*, 994 F.2d 824, 828 (Fed.Cir.1993); *Interstate Gen. Govt. Contractors v. Stone*, 980 F.2d 1433, 1434 (Fed.Cir.1992).

■ As a matter of general contract law, binding contract interpretations have long been favored over non-binding ones. *Torncello v. United States*, 231 Ct.Cl. 20, 27, 681 F.2d 756, 761 (1982); *Hol–Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965); *New Wrinkle, Inc. v. John L. Armitage & Co.*, 238 F.2d 753, 757 (3rd Cir. 1956); *F.W. Woolworth Co. v. Petersen*, 78 F.2d 47, 48–49 (10th Cir.1935); *Sasinowski v. Boston & M.R.R.*, 74 F.2d 628, 633 (1st Cir.1935) (citing cases). The rationale is that the fundamental purpose of contract law is to enforce mutual agreements whenever possible. *Torncello*, 231 Ct.Cl. at 27, 681 F.2d at 761 (stating that the court must always "assume the parties intended that a binding contract be formed"); *Gill v. Benjamin Franklin Realty & Holding Co.*, 43 F.2d 337, 338 (3rd Cir.), *cert. denied*, 282 U.S. 892, 51 S.Ct. 106, 75 L.Ed. 786 (1930). As a result, understandings equally susceptible to interpretation as enforceable requirements contracts or as unenforceable indefinite quantity agreements will be classified as requirements contracts. *Torncello*, 231 Ct.Cl. at 29, 681 F.2d at 762; *A–Transport Northwest Co. Inc. v. United States*, 27 Fed.Cl. 206, 214 (1992); *Ralph Constr., Inc. v. United States*, 4 Cl.Ct. 727, 732 (1984). The instant case must be addressed with this legal bias in mind. Only where it is clear that the contracting par-

ties meant to create an unenforceable indefinite quantity agreement rather than a requirements contract will one be found.

In this case, we find no evidence that a simple indefinite quantity agreement was intended. Rather, we conclude that the agreement on its face bears many of the hallmarks of a requirements contract.

### III

Before assessing the arguments of the parties, a brief review of the legal terrain is in order.

■ In general, cases define three types of enforceable contracts for procurement of services and supplies and one kind of unenforceable mutual agreement. The three types of contracts are definite quantity contracts, indefinite quantity contracts with an ascertainable minimum, and requirements contracts. *Torncello,* 231 Ct. Cl. at 28–29, 681 F.2d at 761–62 (discussing all three types); *Mason v. United States,* 222 Ct.Cl. 436, 444, 615 F.2d 1343, 1347, *cert. denied,* 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980). All enforceable service contracts will fall into one of these categories. On the other hand, indefinite quantity arrangements with no ascertainable minimum are unenforceable even if they are mutually agreed upon, having the legal status of a price list or proposal. As will be discussed below, the unenforceability of such agreements must be made absolutely clear.

The most basic enforceable contract is one for a definite quantity, e.g., buyer agrees to buy 100 units from seller. The parties agree that the instant case does not involve a definite quantity contract.

While there is no definite quantity contract here, contracts for an indefinite quantity can be enforceable if there is an ascertainable minimum commitment on the buyer's part, e.g., buyer agrees to buy at least 100 units from seller. For convenience, we will refer to such agreements as minimum quantity contracts. Because services cannot be stockpiled like goods, contracts for services will rarely be minimum quantity contracts. Neither party here maintains that the agreement at issue is a minimum quantity contract.

■ The requirements contract is another type of enforceable indefinite quantity agreement. It is based on the promise of the buyer to turn to the seller for all requirements or needs which may develop during the contract period, e.g., buyer agrees to buy all the units it may need for one year from seller. Requirements contracts will be enforced so long as the buyer's ability to shop elsewhere is limited in some real way outside the buyer's control. *Torncello,* 231 Ct.Cl. at 48, 681 F.2d at 772 (stating that promisor's "power to terminate [or to obtain covered services elsewhere] must be limited in some meaningful way"). Thus, for a requirements contract to be binding, the buyer cannot of its own volition obtain services other than from the seller. *Torncello,* 231 Ct.Cl. at 28–29, 41–42, 681 F.2d at 761–62, 768–69.[1]

The test of a valid requirements contract is whether the buyer's promise is illusory; when "the promisor retains an option exercisable in his sole discretion [the promise] will be held illusory...." 1 Samuel Williston, A Treatise on the Law of Contracts § 4:24, at 549 (Richard A. Lord ed., 4th ed. 1990) (hereafter Williston). Unless the buyer's freedom to shop elsewhere is limited, the contract will fail for lack of consideration. Plaintiff asserts that a requirements contract was created by the parties

---

1. One case has even held that if the buyer in a service contract promises that the supplier will get all purchase orders that may be issued but reserves the right to do an indefinite amount of the work itself, no enforceable requirements contract is formed. *Ralph,* 4 Cl.Ct. at 733. *Contra Locke v. U.S.,* 151 Ct.Cl. 262, 266–67, 283 F.2d 521, 523 (1960); *Dynamic Science, Inc.,* 85–

1 BCA ¶ 17,710 at 88,383, 1984 WL 13911 (ASBCA 1984) (holding enforceable an agreement to provide services beyond those which government could provide for itself); *Maya Transit Co.,* 75–2 BCA ¶ 11,552 at 55,125, 1975 WL 1551 (ASBCA 1975) (same); *Alamo Automotive Services, Inc.,* 1964 BCA ¶ 4354 at 21,043, 1964 WL 306 (ASBCA 1964) (same).

in this case because defendant was obligated to give plaintiff an opportunity to perform before other suppliers could be called.

■ In contrast to the enforceable indefinite quantity contracts discussed above, those indefinite quantity agreements which lack the saving grace of either an ascertainable minimum or of a limitation on the buyer's freedom to find services outside the agreement are unenforceable because there is no real constraint on the buyer. *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 493, 43 S.Ct. 592, 594, 67 L.Ed. 1086 (1923). Since valid bilateral contracts require that each party be obligated to render a performance to the other, agreements "where the promisor retains an unlimited right to decide later the nature or extent of his performance" are unenforceable. 1 Williston § 4:24, at 546. However, in a requirements contract, the buyer's "promise may be consideration even though a conditional power of choice is left to the promisor. For example, the promisor may reserve an option to terminate [or, presumably, to seek service elsewhere] only after ... a contingency which may never occur...." 1 Restatement (Second) of Contracts § 77 cmt. c (1981).

## IV

With this general legal background in mind, we turn to the specific contentions of the parties.

## A

■ In arguing that an unenforceable indefinite quantity agreement clearly was formed, defendant points primarily to the clause in the agreement which directs that the government is to be "the sole judge in determining when to order service from another source." Paragraph 4 (hereafter the "sole-judge" clause). Defendant maintains that this passage left its right to buy elsewhere absolutely unrestricted rather than contingent on the plaintiff's failure to perform within the time limits set out in Paragraphs 2 and 3. Defendant therefore maintains that this is an indefinite quantity agreement.

An indefinite quantity agreement such as that urged by defendant simply represents an offer by the supplier to sell at a certain price without any acceptance creating an obligation on the part of the buyer. It is in effect a simple price list. As explained above, where one party is not obligated or restricted, there is no basis for a mutually enforceable contract. The crux of defendant's case is that the "sole-judge" clause left the government free from the start to buy ambulance services from whomever it chose without first giving Ceredo the opportunity to perform. Def.Br. of April 26, 1993 at 3.

■ Defendant argues that this non-exclusive interpretation of its duty under the agreement is supported by the agreement's text, which nowhere specifies that it is an exclusive requirements contract. However, the presence or absence of magic terms is not the end of contract analysis; the intent of the contracting parties is the key to contract interpretation. Just as contracts which proclaim themselves to be requirements contract might not be, *e.g.*, *Merriam v. United States*, 107 U.S. 437, 2 S.Ct. 536, 27 L.Ed. 531 (1883); *Ralph*, 4 Cl.Ct. 727 (1984), so too contracts which do not mention the term can be requirements contracts. *Torncello*, 231 Ct.Cl. at 29 n. 3, 30–31, 681 F.2d at 762 n. 3, 763 (indicating that the requirements contract in the case did not identify itself as such); *see A–Transport Northwest Co., Inc. v. United States*, 27 Fed.Cl. 206, 210 (1992) (noting that the exclusive nature of a requirements contract "was understood," not explicit); *see also id.* at 214–18 (analyzing the creation of a requirements contract by implication).

Implied rather than express exclusivity is not unusual in requirements contracts. *E.g.*, *Torncello*, 231 Ct.Cl. at 28, 681 F.2d at 761 (stating that in a requirements contract, the "question is whether it is *implicit* in these [contract] terms ... that the [buyer] promised to gives all of its work" to plaintiff) (emphasis added); *Shader Contractors, Inc. v. United States*, 149 Ct.Cl. 535, 540, 276 F.2d 1, 4 (1960) (stating

that the buyer in a requirements contract *"implicitly* promises that he will obtain his required goods or services from the [supplier] exclusively") (emphasis added). Here, the solicitation leading to the agreement at issue repeatedly presumed that one bidder would be hired[2] to perform all the services[3] described therein.

This implication of exclusivity is strengthened by the presence of estimated orders in the solicitation. Such estimates, while not alone dispositive in classifying agreements as requirements contracts, are at least a hallmark of such contracts. *Brawley v. United States,* 96 U.S. 168, 24 L.Ed. 622 (1878); *Shader,* 149 Ct.Cl. at 543, 276 F.2d at 5–6; *A–Transport,* 27 Fed.Cl. at 217 (linking estimates to contractor's expectation of a requirements contract); Donald G. Gavin, *Government Requirements Contracts,* 5 Pub.Cont.Law J. 234, 244 (1972) (hereafter Gavin). The Federal Circuit recently stated that in contracts subject to the Federal Acquisition Regulations (FAR), "the contracting officer *must* furnish estimated quantities in a solicitation contemplating a requirements contract." *Medart, Inc. v. Austin,* 967 F.2d 579, 581 (Fed.Cir.1992) (citing FAR, 48 C.F.R. § 16.503(a)(1)) (emphasis added). Thus, while all agreements containing estimated orders may not be requirements contracts, requirements contracts will usually include estimated quantities.[4]

Additionally, per-unit pricing like that found in the agreement in this case is an "essential element in a requirements contract" showing that the supplier "is bound to perform regardless of the quantity of work." Gavin at 245 (citing *Russell & Pugh Lumber Co. v. United States,* 154 Ct.Cl. 122, 290 F.2d 938 (1961)).

In sum, contrary to defendant's contentions, the agreement at issue reveals several hallmarks of a requirements contract.

**B**

Plaintiff argues that the contingent nature of the language in Paragraphs 2 and 3[5] compels the conclusion that the agreement gives defendant no right to order ambulance service from another company before plaintiff has an opportunity to perform. Plaintiff acknowledges that the government was free to hire other ambulance companies, but only after plaintiff failed to respond promptly. Plaintiff simply argues that the agreement gives it a right to have the first opportunity to provide ambulance service and that such right, though time-limited, is an inescapable restriction on VAMC's freedom to shop elsewhere. Plaintiff therefore maintains that the agreement is a binding requirements contract. We find this argument persuasive.

If the buyer's ability to shop elsewhere is truly limited, the enforceability of a requirements contract is preserved. Where "the promisor's obligation, though not ab-

**2.** The solicitation implied that *one* bidder would be expected to provide the estimated services: "If your firm is *the successful bidder* ...," Appendix to Def.Br. (Solicitation, Offer and Award) at 2 (emphasis added); "If *the successful bidder* is located outside of the –20– mile radius ...," *id.* (emphasis added); "[A]ward of this contract will be made to the lowest responsive/responsible *bidder* ...," *id.* at 6 (emphasis added). Similar references implying that one contractor is contemplated appear throughout the agreement's 55 pages.

**3.** The solicitation implied that the winning bidder would be expected to provide *all* the estimated services: "Bids will be considered only from bidders who are [able] to furnish service in the volume required for *all the items under this contract.*" Cplt.Ex. 2 (Solicitation, Offer and Award) at 7 (emphasis added); "Bids will be accepted only from bidders [able] to furnish

the parts and service required under the contract." *Id.* at 54.

**4.** Since there is no ascertainable minimum in the agreement at issue, it is either a requirements contract or an unenforceable indefinite quantity agreement, with the former being favored by law. *Torncello,* 231 Ct.Cl. at 42–47, 681 F.2d at 769–71. *See Maintenance Engineers v. United States,* 749 F.2d 724 (Fed.Cir.1984).

**5.** *"If* the contractor fails to furnish ambulance service ... the Veterans Administration reserves the right to obtain the service from another source...." Paragraph 2 (emphasis added). *"When* ... service is not provided within ... the scheduled time, the Veterans Administration reserves the right to obtain the service from another source...." Paragraph 3 (emphasis added).

solute, is not subject to determination upon his sole whim" the promise is enforceable. 1 Williston § 4:24, at 566. In this case, the buyer's ability to shop elsewhere appears to be actually within the seller's control, since it is contingent on the seller's failure to perform. We agree with plaintiff that the text of the contract-in-suit appears to make defendant's ability to purchase service from other suppliers contingent on plaintiff's failure to timely perform.

V

Several other factors bearing on the agreement in suit lend support to our conclusion that the parties entered a valid, enforceable requirements contract.

A

If the government in drafting the agreement actually did not intend to form a binding, exclusive contract, the point would probably have been given more extensive and visible treatment. It is unlikely that such an important and unusual clause would have been buried in Paragraph 4 of Subsection J of Section H of the document. In fact, its placement immediately after the two paragraphs requiring the VAMC to wait before calling other suppliers tends to show that the "sole-judge" clause simply makes clear that VAMC was not required to consult with Ceredo before deciding that a Ceredo ambulance was late and that other suppliers could therefore be called. This interpretation makes sense because the timeliness of ambulance service is sometimes critical.

■■ If, on the other hand, defendant's interpretation of the "sole-judge" clause were used and there were thus no restrictions on defendant's use of other service suppliers, the preceding two paragraphs establishing waiting limits before other carriers may be called are made useless: the government would not be required to call

Ceredo at all, much less wait for a specified time before seeking service elsewhere. A basic rule of contract interpretation is that readings which give meaning to contract terms are favored over those that render terms superfluous. *Quaker State*, 994 F.2d at 828–29 (Fed.Cir.1993) (citing *Granite Construction Co. v. United States*, 962 F.2d 998, 1003 (Fed.Cir.1992)); *Hol–Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965); Restatement (Second) of Contracts, § 203(a) (1981). This rule reinforces our conclusion that defendant's interpretation of Paragraphs 2, 3 and 4 must be rejected.

B

■■ Another related contract principle, alluded to above, is that courts favor binding interpretations over non-binding ones. As a corollary to that rule, non-binding mutual agreements are not easy to make. When parties wish to establish any type of non-binding agreement, the non-contractual nature of the undertaking should be made crystal clear. *Torncello*, 231 Ct.Cl. at 27, 681 F.2d at 761 (stating that the courts must always "assume that the parties intended that a binding contract be formed"). It is for this reason that the United States has established a number of unambiguous mechanisms for creating such non-binding price agreements.[6]

One element that all such schemes for creating non-binding price lists or schedules share is that they make it plain that plaintiff has no contractual expectation until a definite future event, usually the placement of an order. *See, e.g.,* FAR, 48 C.F.R. § 16.703(a) (1992) ("A basic ordering agreement appl[ies] to future contracts (orders).... A basic ordering agreement is not a contract."). The point of such basic ordering agreements (BOAs) is to provide a framework for future contracts without ob-

---

6. The main scheme is found in the FAR, 48 C.F.R. § 16.701–.703 (1992) (providing for so-called "basic agreements" and "basic ordering agreements"). For an overview of provisions used to insure that the government not be bound, see 1 Ralph C. Nash, Jr. and John Cibinic, Jr., Federal Procurement Law, 472–73 (3rd

ed. 1977). Some government agencies have promulgated their own systems to create non-binding agreements. *See, e.g., Modern Systems Technology Corp. v. United States*, 979 F.2d 200 (Fed.Cir.1992) (explaining the Postal Service's "basic purchasing agreement" mechanism).

ligating either party. The contractual expectation of the supplier and the obligation of the government buyer are limited to orders actually placed. This is in marked contrast to the instant agreement which repeatedly implied that one successful bidder would enjoy a stream of future government orders during the contract period.

None of the government's established procedures for creating non-binding agreements was used here, nor does the agreement intimate that plaintiff's contractual expectations are contingent on anything but defendant's need for ambulance services. In the record before us, we find no factual or legal indication that either party here intended to create a non-binding undertaking. This leaves defendant maintaining that VAMC went to the trouble of drafting a 55–page agreement, soliciting sealed bids and selecting the lowest responsible bidder to create neither a binding contract nor a non-binding BOA but rather a nullity.

### C

As discussed above, we are bound by the intent of the parties rather than by any specific terms used in a contract. Still, the terms used in the instant agreement reinforce our conclusion that the contract in suit is a requirements contract. The first page of the document provides that "this *contract* is a rated order under DPAS (15 CFR 350)." Cplt.Ex 2 at 1 (emphasis added). In describing the solicitation's contents, the government checked boxes affirming the inclusion of a "solicitation/*contract* form," of "*contract* administration data," and of "*contract* clauses." *Id.* (emphases added). The document also included a box for the "Name of *Contracting Officer*," which is duly filled in, and is signed for the United States over the notation "(Signature of *Contracting Officer*)." *Id.* (emphases added). Bids were required, and had to be sealed. *Id.* at 48–49. The

use of these regular contracting terms and procedures demonstrate that VAMC meant to assume obligations under this agreement.

Contracts, by definition, cannot be unenforceable. When defendant explicitly expresses an intent to contract and uses the procedures and officials normally associated with the contracting process, it reinforces the conclusion that a contract was created.

### D

The agreement-in-suit clearly provides that in no event was the VAMC entitled to order services from another company until plaintiff had been afforded a chance to perform.[7] The text of the document taken as a whole, along with the circumstances surrounding its adoption, indicates that the parties intended to form a requirements contract, obligating the government to give the plaintiff an opportunity to perform before seeking ambulance service from another supplier. *See Modern Systems Technology Corp. v. United States*, 979 F.2d 200, 205 (Fed.Cir.1992).

### VI

#### A

Based on the foregoing, the defendant's motion for summary judgment is DENIED, and plaintiff's cross-motion for summary judgment on liability only is GRANTED to the extent of our determination that the contract-in-suit was a binding, enforceable requirements contract. (Ultimate findings concerning liability are dependent upon proof that VAMC obtained services in violation of the contract.)

#### B

It appears from the record that the period for discovery has expired and that it is appropriate to set this matter for trial.

---

7. While the government was bound to order all ambulance services from Ceredo first, Ceredo was not obligated to provide more than three ambulances at once. Paragraph 4. This provision protected Ceredo from having to pay any excess costs incurred by the government if three ambulances had already been ordered and Ceredo failed to provide a fourth. Such a clause protecting the supplier in case of multiple simultaneous orders from the government conforms to the FAR's requirements contract system. FAR, 48 C.F.R. § 16.503(a)(2) (1992).

The parties are requested to attempt resolution of the remaining issues without court involvement. The parties shall file a joint status report not later than Monday, October 18, 1993 to advise of the status of settlement and of the necessity for further proceedings.