MaddeN, Judge,
delivered the opinion of the court:
The plaintiff, a Tennessee Municipal Corporation engaged in the business of supplying water, on April 23,1942, entered into a contract to supply water to the Berry Hills Air Crew Classification Center, a Government installation located near Nashville, Tennessee. The plaintiff sues for profits lost because the Government did not, during the period that the contract was in effect, take all of the water which it used from the plaintiff, as the plaintiff claims it was obligated to do, but took most of its water from another supplier.
The Classification Center was being constructed in 1942. It was at first expected that water would first be required in September or October of that year. Some time before April 23,1942, the date of the plaintiff’s contract, the Government’s contracting officer had negotiated with the plaintiff about a contract, and the plaintiff had stated what its rates would be. Four or five days before April 23, the contracting officer had made a contract with the City of Nashville for the supply of water at the project. Two local newspapers had reported the award of that contract to the city, and the plaintiff’s managing officer, Mr. Saindon, had seen those newspaper reports.
A few days later, the Government’s contracting officer Colonel Walsh called Mr. Saindon in and told him that if he would figure closely, they might be able to make a contract. He turned Mr. Saindon over to subordinate civilian officials, and the contract here in suit was agreed upon and signed. The contracting officer had in mind that water would be needed by July 1942 instead of September or October as earlier contemplated; that the City of Nashville would not be able to supply the needed amount of water at the required pressure as early as in July, and that water would be taken from the plaintiff until the city was ready to supply it, the city’s rates being substantially lower than the plaintiff’s rates. But none of these thoughts which were in Colonel Walsh’s mind were imparted to Mr. Saindon.
The plaintiff’s contract called for the expenditure of $28,000 in necessary facilities to furnish the water. It provided that the Government would advance $18,000 of this amount, and repay itself by deducting 10 percent from its *10 water bills. The plaintiff was to put up the other $10,000 which was the estimated salvage value of the facilities to be installed. The contract provided that it might be terminated, at the option of the Government, on 90 days notice. In the discussion during the preparation of the contract Mr. Saindon protested the fact that although the contract called for considerable expenditures by the plaintiff, it contained no provision for a minimum charge regardless of the amount of water used. He was told by the Government officials that, in view of the large quantities of water to be used, 1,500,000 gallons per day, there was no necessity for a minimum charge.
Article X of the contract was as follows:
SERVICES TO BE RENDERED
• Contractor shall supply the water required by the United States for use at the project.
The Government began using water furnished by the plaintiff in July of 1942. At first it took all or most of its water from the plaintiff but, when the facilities of the City of Nashville were completed, it began to take more water from the city and less from the plaintiff until October 1946, when it ceased taking any water from the plaintiff. On June 12,1947, it gave the plaintiff notice of the termination of the contract. The Government had not, during the period of the contract, taken enough water from the plaintiff to recoup its advance of $18,000 by the deduction of 10 percent from its water bills.
The Government would have us interpret Article X of the contract as meaning that the plaintiff was to furnish such water as the Government asked for. As language, standing by itself, it does not mean that. It says that the contractor is to supply the water required l>y the United States for use at the project. If it had said water required it might be argued that it meant some of the water, or such of the needed water as the Government might choose to take from this supplier. But the water required does not leave room for that interpretation. It is not physically possible that the water required could be furnished by the plaintiff, and at the *11 same time by some other supplier. We think the language used has a more than ordinarily plain meaning.
In the preceding discussion we have assumed that the word “required” as used in the contract, was synonymous with “needed.” A considerable number of decisions have dealt with variations of the word “require,” when used in contracts. In Edison Company v. Thacher, 229 N. Y. 172, 128 N. E. 124, the court held that a contract by A to furnish cover castings “as required” in B’s business for a period of twelve months bound A to furnish and B to take all such covers which B used within the period. In Ehrenworth v. Stuhmer and Co., 229 N. Y. 210, 128 N. E. 108, 24 A. L. R. 1354, a contract whereby A agreed to furnish to B as much of a specified kind of bread “as he would require for his customers” as long as the parties remained in business, bound A to furnish and B to take all such bread which B used on his route. In Minnesota Lumber Co. v. Whitebreast Coal Co., 160 Ill. 85, 43 N. E. 774, the contract provided that A should buy “its requirements of anthracite coal for the season of 1886-1887” from B. The court said that the amount of coal “required” for the business of that season was the amount of coal needed for the business, and that the contract bound the parties to furnish, and accept, all the coal needed. To the same effect is Fuchs v. United Motor Stage Co., Inc., 135 Ohio State 509, 21 N. E. 2d 669. In Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, the contract did not use any variation of the word “require,” but the court, in discussing the contract, itself used the word “requirements” as synonymous with “needs.”
The Government cites the case of Merriam v. United States, 107 U. S. 437. In that case the contract did use the expression “as may be required” but the Supreme Court, in interpreting the expression as not equivalent to “as may be needed,” or “as may be used,” expressly found that the construction of the contract asserted by the plaintiff could not have been his understanding of the contract when it was made, but was an afterthought. The plaintiff was one of several bidders on a contract to supply oats, and several contracts were awarded to different parties for parts of the en *12 tire quantity on whicli bids had been asked, and each of the contracts provided that the contractor would supply a specified amount “more or less, or such other quantity, more or less as may be required for the wants of the station” within a specified period. Since, as the court found, neither party thought, when the contract was made, that it meant what the plaintiff in his suit claimed that it meant, the plaintiff’s claim was denied.
In Converse, et al., v. United States, 69 C. Cls. 670, the Government agreed in a dredging contract to furnish the contractor a specified amount of fuel oil in addition to a money compensation for each cubic yard dredged, the oil to be furnished “as and when required.” The contractor used electric power for some of its work, and therefore did not need the oil, but nevertheless claimed that it was entitled to receive it. The court held that it was so entitled, since otherwise it would have been deprived of a part of the consideration for its dredging work. To the Government’s contention that the word “required” meant “needed,” the court said that it is sometimes so used, hut more often is used in the sense of demand, request, or ask of right.
In Tayloe v. United States, 58 C. Cls. 470, affirmed, without opinion, 267 U. S. 576, the contract provided that the plaintiff would furnish teams for use on a Government project “as may be required.” Other similar contracts were made with other persons, and the Government also had its own teams and trucks on the job. The Government’s officer in charge, when work was slack, laid off the teams of contractors on the basis of seniority, that is, the teams last employed were first laid off. The plaintiff sued because his teams were laid off while the Government’s teams, and, to some extent, the teams of other contractors were retained. This court, in its discussion, used the word “required” as if it were the equivalent of “needed” but refused to attempt to substitute its judgment for that of the officer in charge as to whether and how many teams were “required.”
In all the “requirement” decisions discussed above, the courts have reached conclusions which are obviously sound, without attempting to fix some meaning of the word “require” and its variations to fit all cases, as if they were writ *13 ing a dictionary rather than deciding lawsuits. The meaning of language is frequently felt, or sensed, rather than understood. As we sense the meaning of Article X of the contract in its context it means that the plaintiff was to furnish all the water needed for use on the project.
We, in the interpretation of contracts, have felt free to look at the circumstances for enlightenment as to the intention of the parties. Among the circumstances here is the fact that this is a contract to supply water to a Government project. If it were to supply potatoes, or lumber, one could easily imagine several possible supplieis, and might, yielding to strong evidence of intention, obliterate the the from the contract. But the likelihood of two or more suppliers of water installing facilities to put their water in the same pipes at the same time is indeed small.
An important circumstance is that Mr. Saindon had read in the papers of the earlier contract made with the city. Was he obliged to believe that that report was true, or that that contract was effective, when he was called in and asked to make a contract about the same subject matter ? Was it his business to ask the Colonel if he really knew what he was doing? He testified that he did not intend to make a contract subject to the right of some other contractor to absorb a part or most of the benefits of the contract, and that no one remotely suggested to him that he was doing such a thing. That testimony was uncontradicted; our Commissioner believed it, and we have no reason not to accept it.
If it is thought, as the contracting officer seems to have thought, that Mr. Saindon “should have been on notice” of the city’s contract, the short answer is that there is no doctrine in the law which treats one as knowing what he did not in fact know, except when he is a person who asserts that he is an innocent purchaser who should have priority over existing equities or unrecorded titles.
We have, then, a contract with a plain, an unusually plain meaning. We have a Government contracting officer whose intention, completely unexpressed, is contrary to that meaning. We have the other contracting party, who did not write or compose the language of the contract, intending that the contract mean what it said. These being the circumstances, *14 we see nothing in them which would justify us in departing from the language of the contract in order to give effect to the unexpressed intention of one of the parties, the party who chose the language, and by doing so violate the intention of the other party, who took the language to mean what it said.
On March 3,1943, the plaintiff protested the action of the Government taking water from the city. The Government responded, denying any obligation to take water from the plaintiff in any amount and saying that if the plaintiff would request, in writing, the termination of the contract, the Government would consider terminating it if it could be shown that losses were being sustained by the plaintiff and that the termination of the contract would not be a detriment to the interests of the Government. The plaintiff did not request that the contract be terminated. The Government urges that the plaintiff thereby acquiesced in the Government’s interpretation of the contract.
We see nothing in this contention. In the first place, the Government did not offer to terminate the contract. It attached conditions to its statement which could hardly have been satisfied. Of course it would have been detrimental to the interests of the Government to have terminated the contract. It had, for nothing, a second available supply of water, which had to be ready to serve it if it called for service. It would have been foolhardy to have given up that privilege, and, on second thought, it would seem that it would not have done so. Further, there was no reason why the plaintiff should have requested it to do so. It had its facilities in and its money expended. Unless it had a pressing need to salvage those facilities for use elsewhere, it was better to hope that things might take a turn in which the Government would use more of its water, than to close out even that possibility, within less than a year after it had gone to all the trouble and expense necessary to get ready to furnish the water.-
For the first time, at the taking of evidence in this case, the Government contended that the plaintiff would have been unable to fulfill its contract, as the plaintiff interprets that contract. The plaintiff installed its facilities in complete *15 compliance with the specifications of the contract, and could have furnished, at the required pressure, all the water which the Government took and used from both suppliers. We are not willing to speculate now on whether, under other conditions which never occurred, its supply might have been inadequate.
The parties have stipulated that, by reason of the Government’s failure to take all of its water from the plaintiff, the plaintiff lost profits in the amount of $10,945.73. The plaintiff is entitled to a judgment for that amount.
It is so ordered.
Laramoke, Judge, and LittletoN* Judge, concur.