**SHADER CONTRACTORS, INC. and Citizens National Bank of Orlando, Assignee,**

v.

**UNITED STATES.**

No. 186–58.

United States Court of Claims.

April 6, 1960.

Madden, J., dissented in part.

Burton R. Thorman, Washington, D. C., for plaintiffs. Solomon Dimond, Washington, D. C., on the brief.

Earl L. Huntington, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

This case comes to us with no substantial factual dispute between the parties. The main question to be answered is whether the contract in suit is one in which the quantity of the services to be performed by plaintiff is measured by the defendant's requirements or one in which the quantity is fixed and definite.

The plaintiff contractor was awarded a contract by the Department of the Army on June 3, 1955, requiring it to furnish certain services at Camp Hale, Col-orado, during the fiscal year which extended from July 1, 1955, to June 30, 1956. Three different types of services were to be supplied: the collection and disposal of garbage and rubbish and the operation of the sanitary fill and post incinerator; the unloading and stockpiling of coal; and the hauling of coal to certain locations within the camp. The schedule accompanying the invitation referred to these services as Items 1, 2, and 3. It set the prices per ton of material handled at $8.93, $1.50, and $2.50, respectively, and the total quantities of each material to be handled at 4,000, 5,500, and 5,500 tons, respectively. The column which set out the quantities for each item had the word *"Estimated"* typed in.

The special provisions of the contract provided that the contract was to extend from July 1, 1955, to June 30, 1956, unless sooner terminated (Special Provision 1) and that its contemplated scope was the performance of all work in connection with the collection and disposal of ash, trash, edible and non-edible garbage, operation of the sanitary fill, post incinerator, and coal handling. (Special Provision 2.)

Special Provision 8 authorized termination of the contract by the contracting officer whenever he might determine that such action was in the defendant's best interest and it set up procedures for the settlement of claims which might arise out of any such termination.

In addition, these special provisions appeared:

"5. *Etimated Quantities:* Quantities of the various items listed herein are based upon the best information obtainable and represent the estimated and not the actual amounts for which supplies and/or services may be required during the contract period. The fact that specific quantities cannot be determined and given in this instrument shall not relieve the Government of its obligation to order from the Contractor all the supplies and/or services, which, in the judgment of the Con-

tracting Officer, may be needed, and shall not in any case relieve the Contractor of his obligation to fill all orders for supplies and/or services which he may be required to furnish during the contract period. Supplies and/or services for the estimated quantities which are not ordered for delivery prior to expiration of the contract period shall be automatically cancelled.

"9. *Estimated Annual Quantities:* The Government estimates the quantity of refuse to be collected and disposed of per annum as 4,000 tons, and the estimated quantity of coal to be handled per annum as 5,500 tons."

Standard Form 32 (Nov. 1949 edition) was the basis of the contract. We find under the heading "General Provisions (Supply Contract)" the following:

"4. Variation in Quantity

"No variation in the quantity of any item called for by this contract will be accepted unless such variation has been caused by conditions of loading, shipping, or packing, or allowances in manufacturing processes, and then only to the extent, if any, specified elsewhere in this contract."

The specifications of the work to be done are divided into two parts. Part I is a statement of the work generally restating the scope of the entire contract. Part II consists of four sections: collection and disposal of rubbish and garbage; sanitary fill; post incinerator; and coal handling. The first section contains the following specification:

"1–07 Quantities of Work to be Done: The qualities of work to be performed are outlined in the Invitation to Bid. The quantity is estimated only and will be used in formulating and comparing bids. The quantity may vary from 75% to 125% of the figure. The contractor will be required to complete the work specified herein at the contract unit price regardless of the quantity of the work."

None of the other three sections of Part II of the specifications has a similar provision as to percentages of the estimated quantities. The only other contract provision of significance is Specification 1–05, which prescribes how often garbage and refuse would be collected from the various types of buildings at the camp.

Plaintiff contractor committed men and equipment to this project which thereafter were unavailable for other projects because of the remote location of Camp Hale (over 100 miles from Denver, high in the Rocky Mountains). Plaintiff provided hauling services for the defendant throughout the contract period in the following amounts, for which it has been paid: garbage and trash, 2,313.088 tons; unloading coal, 4,430.05 tons;[1] delivery of coal, 2,511.15 tons.

No termination notice was ever given and, at the expiration of the contract period, the plaintiff had been fully paid for work actually done. In August 1956, Shader notified the contracting officer that it desired to file a termination claim for that portion of the estimated services which had not been ordered by defendant. The contracting officer's denial was appealed to the Armed Services Board of Contract Appeals which decided that the contract was a requirements contract and, since there was no showing of bad faith on the part of the Government, no recovery could be allowed. In this action, the plaintiff makes no allegation of bad faith on the part of the defendant.

During the life of the contract, Shader assigned the proceeds to plaintiff Orlando Bank in consideration for moneys advanced, and the defendant was given no-

---

1. The contracting officer made a finding of fact that during the life of the contract, but before the plaintiff was able to perform, the defendant unloaded 584 tons of coal. By adding this figure to the coal unloaded by plaintiff, a figure of 5,014.05 is arrived at which is in excess of 90 percent of the estimated 5,500 tons.

tice of the assignment. Shader is indebted to Orlando on this and other contracts. .

Plaintiff Shader's position in this action is based on its interpretation of the contract as one for the amount of hauling services provided for in the contract estimates (give or take a reasonable variance). The defendant does not see the contract as one guarantying any specific quantity of services; rather it insists that it is nothing more nor less than a requirements contract which it has performed in good faith. The contractor claims that the contracting officer acted arbitrarily in denying it the opportunity to file a termination claim. It asserts that the defendant's action in automatically canceling the portion of the estimated services not required amounted to a termination for the convenience of the Government which entitled the contractor to the benefits of the termination clause.

The law concerning the requirements contract, and its analogue, the output contract, is of comparatively recent development. A requirements contract is simply one in which one party promises to supply all the specific goods or services which the other party may need during a certain period at an agreed price. The other party implicitly promises that he will obtain his required goods or services from the first party exclusively. Though this type of contract lacks the fixed and definable signposts of quantity which are ordinarily found in supply contracts, business necessities require that they be deemed enforceable.[2]

During the last century, in a few instances, contracts of the requirements variety were held to be invalid for a want of mutuality of obligation. But today's courts uphold such contracts and find in them both mutuality of consideration and enforceable cross-promises. Their utility in the commercial world demands that they be recognized as binding.

Of course, since the requirements contract often absolutely fixes the unit price, there is a temptation for one party to take unfair advantage of the other in the matter of the quantity ordered or supplied in times of sharply rising or sharply falling markets. Market conditions may even result in an economic loss to one or the other party even where there is no suggestion of unfair dealing. This is one reason why the requirements contract did not win immediate judicial approbation.

Generally, the courts will not inhibit the performance of the kind of contract in which the expressed understanding is for the sale or purchase of all required goods or services. Ordinarily, where the quantity ordered is considerably more or considerably less than that anticipated from a reading of the contract terms, the courts will protect the aggrieved party from unfair usage by applying a test of good faith to the other party's actions.[3]

The contract before us provided for the collection of refuse and the hauling of coal at Camp Hale, Colorado, for the fiscal year 1956 and it estimated the quantities to be 4,000 and 5,500 tons respectively. As to the refuse, it also said that "the quantity may vary from 75% to 125% of the figure." The basic contest between the parties is whether the whole intent of the contract binds the United States to order the estimated quantities of services, allowing for reasonable variance, or only to order those services of which, in good faith, it had need.

Any meaningful discussion of requirements contracts must begin with Brawley v. United States, 1877, 96 U.S. 168, 24 L.Ed. 622. In that case the plaintiff contracted to furnish for the "post of Fort Pembina, Dakota Territory, eight hundred and eighty (880) cords of * * oak wood, more or less, as shall be deter-

2. T. B. Walker Mfg. Co. v. Swift & Co., 5 Cir., 1912, 200 F. 529, 531, 43 L.R.A., N.S., 730.

3. Standard Magnesium Corporation v. United States, 10 Cir., 1957, 241 F.2d 677; Carstens Packing Co. v. United States, 1917, 52 Ct.Cl. 430.

mined to be necessary, by the post-commander, for the regular supply * * of the troops and employés of the garrison * * * for the fiscal year beginning July 1, 1871 * * *."

Shortly after the contract was let, the plaintiff was notified by the post commander that only 40 cords would be needed and no more than that would be accepted. The balance of the 880 cords were piled up near the fort, Brawley contending that his contract was one for a specific quantity of wood. The judgment of this court was affirmed unanimously. We quote from the opinion of the Supreme Court, 96 U.S. at page 171, the following:

"Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of 'about,' or 'more or less,' or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. * *

"But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, 'about,' 'more or less,' and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight.

"If, however, the qualifying words are supplemented by other stipulations or conditions which give them a broader scope or a more extensive significancy, then the contract is to be governed by such added stipulations or conditions. As, if it be agreed to furnish so many bushels of wheat, more or less, according to what the party receiving it shall require for the use of his mill, then the contract is not governed by the quantity named, nor by that quantity with slight and unimportant variations, but by what the receiving party shall require for the use of his mill; and the variation from the quantity named will depend upon his discretion and requirements, so long as he acts in good faith. * * *"

The Court went on to determine that the contract before it was a requirements contract and that the designated quantity was to be regarded merely as an estimate of what the contracting officer supposed would be required.

█ Thus, we see that where the understanding of the parties, as embodied in the language of the contract, is for the supplying of whatever amounts of goods or services the buyer may require, then the inclusion of a quantity estimate will not be viewed as anything more than a device to assist the parties in coming to terms.[4] This and other courts have consistently applied the principles enunciated in the Brawley case in interpreting requirements contracts, apparently in the desire to promote flexibility of quantity where the intent of the parties so dictates.

Keeping this in mind, it seems clear that the parties in the instant case understood that the defendant's good faith requirements would be the measure of services used and paid for. Where a contract provides, as this one does, that the quantities mentioned are estimates only, and that the obligation of the defendant is merely to order and the plaintiff to

4. Walters v. United States, 1955, 130 F. Supp. 360, 131 Ct.Cl. 218; Sandor S.

Hirsch and Pernice Contracting Corp. v. United States, 1945, 104 Ct.Cl. 45.

supply all services which *in the judgment of the contracting officer are needed,* we have a classic example of a requirements contract as described in the Brawley holding.

This is not the type of contract wherein the only measure of quantity is an estimated figure, having no reference to any defining factor and qualified by "about," "more or less," or the like. That kind of contract may logically be viewed as one for a definite quantity, give or take an insignificant variation.[5] But the contract now before us qualifies the given quantities by identifying them as "estimates" and what is really the "dominant measure" of quantity[6] is the amount which the contracting officer, in good faith, judges to be needed at Camp Hale for the year.

It would have been impossible, as the plaintiff well knew, for the defendant to guarantee or warranty that any specific amount of refuse would be generated or that any specific amount of coal would be consumed during the contract period. The exigencies of national security in today's world make the number of troops situated at any given installation subject to sudden, unexpected upward and downward fluctuations.

Special Provision 5 makes it quite clear that the parties realized that they were dealing in items not easily computed. This provision indicates that because specific quantities could not be determined, it would be necessary to rely on the best available information. This does not relieve the Government, the contract provides, from the duty of obtaining all its needs from the plaintiff, nor does it relieve the plaintiff from the duty of supplying all of the defendant's needs.

Plaintiff calls our attention to Gemsco, Inc. v. United States, 1950, 115 Ct.Cl. 209 which, it is said, modified the leading case of Bickett Coal & Coke Co. v. United States, 1929, 67 Ct.Cl. 53. In Gemsco it was held that the Government had breached a contract in which the contractor had agreed to supply 25,000 Navy nurses' emblems within 90 days, if called for. The Government, after ordering a fraction of that number, changed the design without notifying the contractor, thereby rendering useless the emblems already made. It is our impression that the court in that opinion merely determined that the defendant had not acted in complete good faith in its dealings with Gemsco; it did not attempt any interpretation of the unambiguous terms of the contract.

The Bickett case, in which the agreement was for 67,200 tons of coal "as called for on or before June 30, 1921 by Camp Quartermaster, Camp Custer, Mich.," held that the Government was not liable for the coal that had not been called for when it was decided to abandon the camp prior to the completion of the contract period. That contract, like the one presently before us, provided for cancellation of goods not called for at the expiration of the contract.

Plaintiff suggests that the Gemsco decision modifies the holdings in the Brawley and Bickett cases in instances where the dealings are with a peculiar product or service rather than with a commodity like coal, lumber, or stone which is readily marketable elsewhere if not needed by the buyer. Shader contends that a similar case exists here since men and equipment became unavailable for any other work due to defendant's erroneous work estimates. The dictum that suggests that result has no applicability to this case.

Plaintiff knew from the contract terms (Specification 1–05) that the routine of trash pickups that it followed in the first weeks would probably be the routine that it would follow throughout the contract.

5. United States v. Republic Bag & Paper Co., 2 Cir., 1918, 250 F. 79.

6. An undivided Court affirmed the Court of Claims in rejecting a contractor's claim that the contract was for a fixed quantity of building sand rather than for the defendant's requirements. It held that the estimates were not definite obligations and that the contractual intent was for the amount needed for the project. Smoot v. United States, 1915, 237 U.S. 38, 35 S.Ct. 540, 59 L.Ed. 829.

If the amount of refuse generated within those first few weeks was considerably less than a pro rata portion of the entire estimate, plaintiff must then have anticipated that the total refuse for the contract period would be less than the estimate. Surely sound business practice dictates that men and equipment which the contractor knows will probably not be needed to accomplish a job ought not be allowed to lie idle at the jobsite. Any loss resulting from such a practice should not be the responsibility of the defendant. Moreover, we must assume that any such risk of loss was considered by the parties, and that the accepted contract price bid reflected a satisfactory resolution of the risk.[7]

The instant case is clearly distinguishable from Sylvan Crest Sand & Gravel Co. v. United States, 2 Cir., 1945, 150 F.2d 642, 643, in which the defendant was held liable for failure to order trap rock which had been contracted for two years previously. The contract contained the following provisions: "Trap Rock * * * approx. 4,000 tons * * *. To be delivered to project as required. Delivery to start immediately * * *. Cancellation by the Procurement Division may be effected at any time." There is no doubt that the parties contracted for a specific tonnage of trap rock. It was the schedule of delivery which was to depend on the project requirements, and not the amount purchased. Moreover, the absolute cancellation clause, which gave the Government the right unilaterally to void the contract, all the while requiring the plaintiff to stand ready to perform, gave the Government an unconscionable advantage.

■ Based on the nature of the services to be supplied as well as the plain language of the contract, we are convinced that Shader and the Army intended that this be a contract the performance of which was to be measured by the requirements of the defendant.

The figures given as estimates were that and nothing more. They were not guarantees or warranties of quantity, but figures which the bidders might reasonably employ so as to make realistic quotations. Nor does clause 4 of the General Provisions alter this fact. A careful reading of that clause shows that its inclusion in the Standard Form is directed toward the supplier in situations in which he is furnishing goods rather than services, and then only when the contract quantity is already fixed at an absolute figure.

It is true that with reference to the removal of trash, the contract provided that the quantity might vary from 75 percent to 125 percent of the estimate. The plaintiff maintains that this language set minimum and maximum quantities and reflected an intention to make the contract one for fixed and specific amounts. Although no such language appears with respect to the handling of coal, the plaintiff apparently feels that the contract quantities for those items are, by implication, also fixed and definite.

But since the measure of the quantities in the contract is the needs of the defendant, we fail to see how further qualifying a qualified estimate can alter the clear meaning of the contract language. The very context of the pertinent specification proves this. Specification 1–07 says (for at least the third time in the instrument) that the quantity is estimated only. Using a permissive tone in the qualification, it says that the quantity *may* vary and goes on to say in the next sentence that "[T]he contractor will be required to complete the work specified herein at the contract unit price *regardless of the quantity of the work.*" If the parties meant this to be a contract for not less than 3,000 tons and not more than 5,000 tons, why would they have included the last sentence? Surely, it was not within their contemplation that the

---

7. It should be noted that in the Brawley case the plaintiff had carted the 880 cords of wood over 300 miles from central Minnesota to Fort Pembina. The wood was left on the land of one Myrick when it was refused by the post commander. It was later sold by Myrick.

plaintiff would have the right to refuse to collect any more garbage or trash, if it chose, once it had carted off the 5,000th ton.

This case is different from both Johnstown Coal & Coke Co. v. United States, 1929, 66 Ct.Cl. 616 and Louisville Soap Co. v. Taylor, 6 Cir., 1922, 279 F. 470, 472. In Johnstown, the Government contracted to purchase coal for use at a Veterans Administration hospital for the fiscal year and estimated the quantity at 8,200 tons. The contract provided that, "[T]he estimated quantity of coal * * is based upon the previous annual consumption, but the right is reserved to order a greater or lesser quantity, not to exceed fifty percent, according to the actual requirements of the service."

It will be noted that the defendant bound itself not to exceed a 50 percent variance from the estimated quantity; this is not the same as saying that an estimated quantity *may* vary. It was quite correct for this court to hold, therefore, that the contract was a requirements contract determined by the actual requirements of the Government. Judgment was granted for the plaintiff for the defendant's failure to prove that the 1,400 tons actually ordered in fact reflected the requirements of the service. It was not inconsistent to hold at the same time that the defendant had guaranteed that its requirements would fall within the 50 percent range. The court implied that the failure of the Government to notify the supplier that the hospital had been closed, even when he repeatedly requested permission to deliver the balance of the coal, amounted to a failure of good faith and fair dealing.

The contract in the Louisville case, supra, is representative of the contracts in the line of cases which share its *rationale*. The quantity reference was: "Louisville Soap Company's requirements from April 1, 1918, to March 31, 1919, 20,000 round barrels minimum, 40,000 round barrels maximum." The court felt that the minimum-maximum provision was not merely an estimate; rather, it believed that the parties intended (as in the Johnstown case) that the requirements should control only between those figures as upper and lower limits. Certain other language in the Louisville contract provided that the parties could negotiate further for amounts in excess of the maximum. The court believed that this was indicative of an intent that the minimum-maximum provision would control over the requirements provision.

The Louisville contract purported to be a requirements contract but it proceeded to specify what those requirements would be. The distinction between that situation and this one, where it was made clear that the defendant's needs and not the variable estimates would control, should be noted.

We think that the garbage and refuse specification in the Shader contract more nearly resembles the contract provisions in Marx v. American Malting Co., 6 Cir., 1909, 169 F. 582, than it does either the Johnstown or Louisville contracts. In the Marx case, the contractor agreed to furnish the malting company with its malt requirements through a certain date. The contract also said that the amount of malt to be used would be between 15,000 and 20,000 bushels. The court held that the minimum-maximum provision was itself only an estimate of the probable requirements. As a result, the seller was required to supply all of the buyer's requirements though greatly in excess of the maximum. The court indicated that it is fundamental that the prime object and purpose of the parties be ascertained. It did this and came to the conclusion that the parties did not have in mind a certain number of bushels of malt, but, rather, as much as the business of the purchaser would require during the contract period. That, we believe, was also the type of contract that the parties before us intended.

From the plaintiff's point of view, the inclusion of contract clauses providing for the automatic cancellation of the services which had not been ordered prior to the expiration of the contract and for termination for the convenience of the

Government is indicative of an intent to make this a contract for a specified quantity. We are not persuaded that this is true since there are a number of reasons why the parties might have agreed to the inclusion of such clauses in a requirements type contract. In Bickett Coal & Coke Co. v. United States, supra, a clause providing for the cancellation of goods not called for at the expiration date of the contract was held not to impair the underlying requirements nature of the contract.

Then also, the contracting officer did not repudiate Shader's rights under the termination clause. He merely indicated that the clause had no applicability in this case because there had been no termination. The clause might have been applicable had there been a complete termination of the contract prior to June 30, 1956, but not where there had been mutual performance through the final day of the contract period.

Based on the foregoing authority and reasoning, we find that the contract between Shader and the United States was for services to be measured by the defendant's requirements. Since the defendant purchased all its necessary services from the plaintiff, it has fully performed its part of the contract.

The plaintiffs' motion for summary judgment is denied; the defendant's cross-motion for summary judgment is granted. The petition will be dismissed.

It is so ordered.

LARAMORE and WHITAKER, Judges, concur.

MADDEN, Judge (dissenting in part).

I think that section 1–07 of the contract should be interpreted as entitling the plaintiff to be paid for a minimum of 75 percent of the estimated amount of the work, less the cost of performance. The contract, read as a whole, was confusing and ambiguous, but the Government drafted it, and under well-settled rules of construction its ambiguities should be resolved against the party which drafted it.