The **FRANKLIN COMPANY**

v.

The **UNITED STATES.**

No. 85–66.

United States Court of Claims.

July 20, 1967.

Theodore M. Kostos, Philadelphia, Pa., for plaintiff. Stassen, Kephart, Sarkis & Kostos, Philadelphia, Pa., of counsel.

Stephen M. Joynt, Bladensburg, Md., with whom was Asst. Atty. Gen., Barefoot Sanders, for defendant. Frances L. Nunn, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

DAVIS, Judge.

The Franklin Company was engaged in June 1962 to prepare technical manuals for the Army and its Engineer Maintenance Center under an "indefinite delivery requirements type contract", with payments originally estimated at $1,063,795.92. The agreement contained both cost-plus-fixed-fee and fixed-price provisions—the latter being the basis for this suit. Although the estimated cost of work to be performed under the fixed-price section was $471,213.75, plaintiff received only about $212,933.06 worth in assignments and urges that the Government's failure to provide sufficient projects, which were available but assigned to companion contractors, caused an improper and uneven flow of work, resulting in increased costs per unit for the items directed to Franklin. It seeks recovery for these additional costs, alleging that the diversions constituted a breach, or a change under the contract, or a partial termination for the Government's convenience. Compensation is also sought for three projects which, it is contended, were improperly cancelled and reassigned to the others.

The contract was part of a comprehensive manual procurement program conducted by the Engineer Maintenance Center. This project included receiving and disassembling items of equipment, analyzing procedures for their repair, maintenance and operation, and incorporating the information into printed manuals for use of servicemen and civilian employees. The work was conducted at two Ohio army depots—Marion and Columbus. To facilitate procurement, the Government let separate contracts, nearly identical on their face, for the operations to be performed at each depot. These agreements were for one-year terms, interlacing rather than fully overlapping. Plaintiff's contract, performed at Marion, extended from June 20, 1962 to June 19, 1963. During this period, the parallel Columbus contracts were held by the Hayes Corporation (from Dec. 1, 1961 to Nov. 30, 1962) and the Technical Services Corporation (Dec. 1, 1962–Nov. 30, 1963). Since it generally took six or more months to complete a work order, assignments were normally issued during the first six months of the annual term. Bruce E. Scott, an official of the Engineer Maintenance Center, was responsible for allocating the jobs to the respective contractors.

Franklin's claim that it was improperly short-changed in its assignments was rejected by the contracting officer and the Armed Services Board of Contract Appeals (ASBCA No. 10285). Each party now asks for summary judgment on the basis of the administrative record.

The answer to these requests lies chiefly in the meaning of the contract. Plaintiff sees it as obligating the defendant to direct to the Marion depot all of the Maintenance Center's technical-manual work falling within the numerous equipment-types enumerated in the agreement, at least up to the specified "estimated requirement" ($471,213.75). The Government counters that its responsibility was only to make a good faith effort to assign to plaintiff that portion of the whole program which was normally performed at Marion, leaving to Columbus the part traditionally and ordinarily allocated there—and that this was in fact done.

In choosing between these interpretations, we look both to the written terms and to the surrounding circumstances, availing ourselves "of the same light which the parties possessed when the contract was made." Merriam v. United States, 107 U.S. 437, 441, 444, 2 S.Ct. 536, 540, 27 L.Ed. 531 (1882). Though these two components—words and setting—may be differentially stressed in different situations, courts have never completely shut their eyes to evidence of the parties' shared understanding drawn from the transaction's milieu or working-out. See Micrecord Corp. v. United States, 361 F.2d 1000, 1004, 176 Ct.Cl. 46, 53 (1967); Williamsburg Drapery Co. v. United States, 369 F.2d 729, 735, 177 Ct.Cl. ——, —— (1966); Cresswell v. United States, 173 F.Supp. 805, 811, 146 Ct.Cl. 119, 126 (1959); 3 Corbin, Contracts §§ 536, 539 (1960). This is as true of requirements-type contracts as of the more precise kind. Merriam v. United States, supra; First Suburban Water Utility Dist. v. United States, 129 Ct.Cl. 8, 13 (1954).

Plaintiff's contract defines the "scope" of Franklin's duties in this way:

1–1 *Scope:*

a. The work to be accomplished herein represents that which is required to perform phases of the technical manual program, including related provisioning work required, which is the assigned responsibility of the Engineer Maintenance Center, Columbus, Ohio. The contract site is the Marion Engineer Depot, Marion, Ohio. * * *

Thirty-three "family types" of engineer equipment, ranging from augers to tractors, were listed as "subject to the preparation of publications under this contract," although the Government could also assign other types of equipment if needed (§ 1–8(b)). While the defendant estimated the dollar amount of its requirements (i. e. the work to be assigned to Franklin), the agreement specified that "the Government will not be held responsible for any variation or fluctuation thereof" (§ 1–6). The Government also retained the right to have technical manuals prepared by other means, such as "by contract obtained by competitive negotiation for preparation of TM's [technical manuals] in excess of this contractor's capacity to complete under the contract, or where the necessary technical capabilities cannot be equaled under this contract" (§ 1–8(a)). The Hayes and Technical Services contracts were identical in language, with two major exceptions—their "Scope" clauses indicated that the contract site was the Columbus Engineer Depot, and, also, three items of equipment were listed in the Columbus contracts which were not mentioned in plaintiff's.

By themselves, the words of the single agreement before us could lead to the interpretation plaintiff puts upon them, but they are also open (perhaps less easily) to the defendant's view that the "phases of the technical manual program" (in the "Scope" provision), taken together with the reference to the "contract site" at Marion, refer to the segment of the total program normally done at Marion (in contrast to that performed at the Columbus depot). The decisive clue, we think, lies in the contractual history and background.

The chief factor is that from 1959 through 1963, when plaintiff's present one-year contract terminated, the Engineer Maintenance Center's manual procurement program was operated on a dual-contract basis—Marion and Columbus. This system was created to maximize use of the facilities at both depots. Franklin's present contract was plainly a part of this unified project. The Engineer Maintenance Center did not indicate, either at the prebid conference or when plaintiff's agreement was signed, that it would suddenly halt the assignment of work to its Columbus contractor (then, Hayes Corporation) and channel all subsequent orders to Franklin. Nor did the Government alter its dual procurement policy during the course of plaintiff's performance; bids were accepted and the Columbus contract, previously held by Hayes, was awarded, at the end of

November 1962, to the Technical Services Corporation. There is likewise no reason to reject the ASBCA's findings that Franklin knew, from the beginning, that it would have to share its assignments with the Columbus contractor. Plaintiff was no stranger to the Maintenance Center's manual procurement program. It had been awarded and performed the immediate predecessor contract at the Marion Depot (1961–1962)— a document identical, in all material respects, to the present contract. During that period, the dual assignment program, which is now challenged as being beyond the scope of plaintiff's agreement, was fully in existence. Franklin, although then possessing the Marion contract, bid in addition for the Columbus contract which was eventually awarded to the Hayes Corporation in November 1961; apparently plaintiff then assumed that the letting of the Marion contract did not foreclose the making of further work assignments to Columbus. Moreover, at the prebid conference for the contract in suit, the Maintenance Center's traditional work assignment process seems to have been discussed. If there were any indication that the Government intended to embark on a new policy of the dimensions now advanced, the change would surely have been reviewed at that conference. The failure of anyone to raise this issue supports the position that plaintiff understood that the new contract, the same as its predecessor (which Franklin also held), would be conducted in accordance with the dual assignment program, an arrangement which appears to have satisfied plaintiff up to then.

Franklin's conduct during performance of the current contract likewise helps to sustain the Board's conclusion. See Williamsburg Drapery Co. v. United States, supra, 369 F.2d at 735, 177 Ct.Cl. at —— (1966); Universal Match Corp. v. United States, 161 Ct.Cl. 418, 422 (1963). Although aware that work was being given to the Columbus facility, plaintiff continued to acquiesce in the practice. In January 1963, the contractor met with the responsible government officials and complained of unforeseen losses caused by a poor distribution and limited volume of work. The relief requested was a price adjustment, not a stopping of assignments to Columbus. The Board did not find that Franklin indicated, during performance, that it considered the Government's actions in allocating work to Columbus as a breach of its contract, a serious contractual change, or a partial termination. In addition, during this time Franklin once again actively, but unsuccessfully, sought to succeed the Hayes Corporation as the contractor at the other plant. (That contract was awarded to the Technical Services Corporation.) Surely, plaintiff would not twice seek a contract which, in its view, offered almost nothing beyond that already secured by its Marion agreement. We are now told that plaintiff would hold the defendant responsible on each of the Marion and the Columbus contracts for all of the technical manual requirements, but this after-the-fact assumption of extreme public largesse is inconceivable. The Government is no more devoid of minimal business sense than contractors, and Franklin could not have expected the Army to bind itself twice for the same work. "The defendant would not have accepted such a requirement and the plaintiff would not have asked it to agree." Deloro Smelting & Ref. Co. v. United States, 317 F.2d 382, 387, 161 Ct.Cl. 489, 497 (1963). "Courts are loath to say that good sense is not good law." Niagara Mohawk Power Corp. v. Federal Power Comm'n, C.A.D.C., 379 F.2d 153, decided May 18, 1967.

■ The argument is then made that the Board's and the Government's view of the contract cannot reflect the parties' true understanding because there were, in fact, no "normal" assignments (or requirements) for Marion. Mr. Scott at the Engineer Maintenance Center, it is said, had complete and unfettered discretion in assigning work to either depot and actually exercised such limitless authority. The Board has permissibly found, however, that the assignments

by the Maintenance Center to the contractors at Columbus and Marion followed a usual and ascertainable pattern, known to the plaintiff. Because of the lesser ability of the Columbus Depot to process heavy equipment, Marion was ordinarily assigned the heavier items, Columbus receiving the lighter ones. That the assigning officer also considered other factors (such as the time remaining in the respective contracts and the contractors' workloads) did not make his decision arbitrary or prevent Marion from having recognizable responsibilities. Given the technical and time-consuming nature of the assignments, the limited duration and staggered terms of the contracts, and the Government's right to have manuals produced by other means if its present contractors lacked the capacity or technical expertise to complete an assignment, it was reasonable to consider these factors. No evidence suggested lack of good faith in the issuance and distribution of the work assignments, and the Board rightly found that the record did not show "anything but good faith in this regard." More than substantial evidence upholds the Board's findings.[1]

There was thus a shared understanding infused into the anemic words of the contract, and that mutual intention contemplated a division, according to the known past practice, between the Marion and the Columbus jobs. The contract's "estimated requirement", forecast by the Government in a monetary amount, did not override this consensus. The agreement expressly and unequivocally stated that "the Government estimates of requirements * * * are not guaranteed and the Government will not be held responsible for any variation or fluctuation thereof" (§ 1–6). In this light, inclusion of the financial estimate should be viewed as a device to assist the parties in coming to terms (Shader Contractors, Inc. v. United States, 276 F.2d 1, 5, 149 Ct.Cl. 535, 542–543 (1960); 32 C.F.R. § 3.409 (b) (1965)), not as a mandatory provision.

This interpretation of the contract—contemporaneously accepted by the parties, fulfilled in performance, and now executed by us—does not invalidate the agreement, as plaintiff fears. Although the ultimate quantity of work to be performed was not certain at the time the contract was signed, the parties' burdens were not illusory but real and substantial. The Government was obligated to make a good faith effort to assign to Franklin those aspects of the technical manual program which were customarily given to the Marion Depot. Franklin, in turn, agreed to do this assigned work at specified fees. Neither party was wholly at large. The mutual undertakings formed a limited type of requirements compact sanctioned by the law. See, e.g., Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622 (1877); Shader Contractors, Inc. v. United States, supra, 276 F.2d at 4–6, 149 Ct.Cl. at 541–543 (1960); Ready-Mix Concrete Co. v. United States, 158 F.Supp. 571, 573, 141 Ct.Cl. 168, 169 (1958); 32 C.F.R. § 3.409 (b) (1965).

■ The lesser of plaintiff's claims seeks recovery for three work assignments which, it says, the Government improperly cancelled. These projects,

---

[1] The quotations from the testimony of Mr. Scott and others, which plaintiff cites to us, show no more than that (a) all the work, on both contracts, could be physically done, if that had to be, at the Marion depot, and (b) the assignments were not made on a rigid or iron basis. But we have been referred to nothing substantial in the record which indicates that Scott or his assistants actually exercised unfettered power in allocating the work, disregarded the accepted dividing-lines, or took into account extraneous considerations. Nor has plaintiff pointed to anything in the administrative record demonstrating that the assignments under this contract departed significantly from the accepted practice. On the record, we cannot overturn the Board's findings that (i) there was in fact an accepted practice, (ii) this practice was followed, in the main, under the present contract, (iii) the Government officials acted in good faith, and (iv) the practice was known to plaintiff at the time it consummated the contract.

calling for revision of three technical manuals, were issued to Franklin between December 31, 1962 and January 8, 1963. It was asked to furnish a final production schedule within two weeks. These plans were not timely submitted, and a second request was made on February 5, 1963. Plaintiff's project director replied that, "At the time this organization received these assignments there was no personnel available to place them into provisioning. However, since that time, personnel has become available and the schedules will be submitted as indicated below." The belated work schedules went beyond Franklin's contract expiration date of June 19, 1963 (one schedule ended in August 1963) and were rejected. On February 7, Franklin resubmitted the schedules, now planning to have 95% of the work completed by June 15, 1963. The Government found the schedules unacceptable and cancelled the projects. Cancellation, however, affected only the narrative requirements since the parts portion, as well as other work, had been completed and paid for. The ASBCA found the cancellations justified. We agree.

Even as to work normally assigned to Marion, Franklin's contract, as we have noted, did not make it the exclusive producer of technical manuals for the Engineer Maintenance Center. In certain circumstances, the Government could have such manuals prepared by other means. These included situations when the work assignment would be "in excess of this contractor's capacity to complete under the contract, or where the necessary technical capabilities cannot be equaled under this contract."

Either of these provisions supports the Government's cancellation and reassignment. These were many indications that the work would not be completed by June 19, 1963—the contract termination date. Plaintiff's project director had spoken of the firm's personnel difficulties. The submission of the work schedules, themselves, was late. The completion date for the first rejected schedule was placed much after the contract period. Then,

the revised schedule showed 95%, not 100%, of the work to be completed by June 15, 1963. Even if one were to accept plaintiff's forecast at face value, it is unlikely that all the necessary work would have been finished by June 19. As found by the Board, there normally was a "carry-over" for "final clean up work" after the target completion date of any work schedule. The Government was also allowed two weeks to review submitted work. If a manual had to be returned to the contractor, corrective work would probably have extended beyond the term and there might then be a new contractor at the site. It was proper for the Government to consider these contingencies. The Board did not err in determining that the decision to cancel and reassign was within the bounds of responsible discretion under the contract.

For these reasons, the plaintiff cannot recover. The defendant's motion for summary judgment is granted and the plaintiff's is denied. The petition is dismissed.